# No. 23-50131

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RAYMOND CHARLES, JR.,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas

---

**Brief of Defendant-Appellant**

---

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN L. DAVIDSON
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## Certificate of Interested Persons

### UNITED STATES v. RAYMOND CHARLES, JR., No. 23-50131

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Raymond Charles, Jr.,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley C. Hoff,** former U.S. Attorney;

4. **Monica L. Daniels** and **Brandi Young,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Anthony J. Colton** and **John J. Velasquez,** Assistant Federal Public Defenders, who represented Defendant-Appellant in the district court; and

7. **Kristin L. Davidson,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kristin L. Davidson
KRISTIN L. DAVIDSON
*Attorney for Defendant-Appellant*

i

## Statement Regarding Oral Argument

Charles raises three issues on appeal, but only one would benefit from oral argument: whether his conviction of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), violates the Second Amendment. This issue involves an intervening Supreme Court decision—*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)—that abrogates this Court's precedent.[1]

The remaining issues are foreclosed by this Court's precedents and raised to preserve for further review by the Supreme Court.

---

[1] Charles is aware of at least one pending case in this Court, *United States v. Collette*, No. 22-51062, in which the issue was preserved below. *Collette* has been tentatively scheduled for oral argument the week of October 2, 2023.

# Table of Contents

Certificate of Interested Persons.......................................... i

Statement Regarding Oral Argument.............................. ii

Table of Authorities.......................................................... v

Subject Matter and Appellate Jurisdiction ...................... 1

Issues Presented for Review............................................. 2

Statement of the Case....................................................... 3

Summary of the Arguments ............................................. 11

Arguments and Authorities.............................................. 14

I.   18 U.S.C. § 922(g)(1) violates the Second Amendment
     because firearm possession is protected by the plain text of
     the Amendment and the Government cannot show a
     historical tradition of categorically disarming felons.............. 14

     A.  Standard of review. ............................................... 15

     B.  *Bruen* abrogated the Second Amendment framework
         previously employed by circuit courts after *Heller*. ........... 15

         1.  The Second Amendment's plain text covers the
             conduct prohibited by § 922(g)(1): possession of a
             firearm. ........................................................ 16

         2.  Felons are among "the people" protected by the
             Second Amendment. ....................................... 17

         3.  The Government cannot show that § 922(g)(1) is
             "consistent with the Nation's historical tradition of
             firearm regulation."....................................... 21

     C.  Under the same framework, § 922(g)(1) violates the
         Second Amendment as applied to felons like Charles. ...... 39

II. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted in this case. (Foreclosed.) ........................................ 41

   A. Standard of review. ............................................. 41

   B. 18 U.S.C. § 922(g)(1) exceeds Congress' power to regulate interstate and foreign commerce. ........................ 42

III. Because the ACCA's requirement that the defendant has at least three prior convictions "committed on occasions different from one another" is a factual determination that increases the defendant's minimum and maximum sentences, it must be alleged in the indictment and proven to a jury beyond a reasonable doubt or admitted to by the defendant. (Foreclosed). ........................................... 47

   A. Standard of review. ............................................. 48

   B. Because Charles's sentence was increased based on a fact not alleged in the indictment or proven to a jury beyond a reasonable doubt, it must be vacated. ................ 48

Conclusion ...................................................................... 53

Certificate of Compliance with Type-Volume Limit ...................... 54

# Table of Authorities

## Cases

*Alderman v. United States,*
  562 U.S. 1163 (2011) ........................................................... 43, 44

*Alleyne v. United States,*
  570 U.S. 99 (2013) ...............................................*passim*

*Almendarez-Torres v. United States,*
  523 US. 224 (1998) ................................................. 50

*Apprendi v. New Jersey,*
  530 U.S. 466 (2000) ..............................................*passim*

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .............................................*passim*

*Firearms Pol'y Coal., Inc. v. McCraw,*
  __F. Supp. 3d __, No. 4:21-cv-1245,
  2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) ............................ 34

*In re Bonvillian Marine Serv., Inc.,*
  19 F.4th 787 (5th Cir. 2011)....................................... 15

*Industrial Union Dept., AFL-CIO v.*
  *American Petroleum Institute,*
  448 U.S. 607 (1980) ................................................. 45

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019)..................................*passim*

*Mathis v. United States,*
  579 U.S. 500 (2016) ................................................. 51

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .............................................*passim*

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ....................................... 31, 36, 37

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ...................................................... 44, 45, 46

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
   *Firearms, & Explosives,*
   700 F.3d 185 (5th Cir. 2012) ....................................................... 30

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022).........................................................*passim*

*NLRB v. Noel Canning,*
   573 U.S. 513 (2014) ...................................................................... 24

*Range v. Att'y Gen. United States of Am.,*
   69 F.4th 96 (3d Cir. 2023) (en banc) ...................................*passim*

*Scarborough v. United States,*
   431 U.S. 563 (1977) .................................................42, 43, 44, 46

*United States v. Alcantar,*
   733 F.3d 143 (5th Cir. 2013) ................................................. 43, 47

*United States v. Booker,*
   644 F.3d 12 (1st Cir. 2011)................................................... 30, 31

*United States v. Bullock,*
   No. 3:18-CR-165-CWR-FKB,
   2023 WL 4232309 (S.D. Miss. June 28, 2023) ........................... 40

*United States v. Collette,*
   No. 22-51062 (5th Cir.) ................................................................. ii

*United States v. Eddins,*
   451 F. App'x 395 (5th Cir. 2011) ................................................. 52

*United States v. Hill,*
   927 F.3d 188 (4th Cir. 2019) ....................................................... 43

*United States v. Knowles,*
   29 F.3d 947 (5th Cir. 1994) ......................................................... 41

*United States v. Kuban,*
  94 F.3d 971 (5th Cir. 1996) ........................................................ 43

*United States v. Lopez,*
  514 U.S. 549 (1995) .................................................42, 43, 44, 47

*United States v. Massey,*
  849 F.3d 262 (5th Cir. 2017) ...................................................... 14

*United States v. Melendrez-Machado,*
  2023 WL 4003508 (W.D. Tex. June 14, 2023) ........................... 20

*United States v. Miller,*
  307 U.S. 174 (1939) .................................................................... 34

*United States v. Morrison,*
  529 U.S. 598 (2000) ............................................................. 45, 47

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023),
  *cert. granted,* No. 22-915 (U.S. June 30, 2023) ...................*passim*

*United States v. Riley,*
  No. 1:22-cr-163 (RDA), 2022 WL 7610264
  (E.D. Va. Oct. 13, 2022) ............................................................ 19

*United States v. Seekins,*
  No. 21-10556, 2022 WL 3644185,
  (5th Cir. Aug. 24, 2022) (per curiam) (unpublished),
  *petition for cert. filed,* No. 22-6853 (U.S. Feb. 21, 2023)............ 41

*United States v. Seekins,*
  52 F.4th 988 (5th Cir. 2022) ................................................. 42, 43

*United States v. Sitladeen,*
  64 F.3d 978 (8th Cir. 2023) ........................................................ 20

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ...................................................... 31

*United States v. Stone,*
  306 F.3d 241 (5th Cir. 2002) ...................................................... 52

*United States v. Toure,*
  965 F.3d 393 (5th Cir. 2020) ...................................................... 41

*United States v. Valencia,*
  66 F.4th 1032 (5th Cir. 2023) ..................................................... 52

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990) .................................................................. 18

*United States v. White,*
  465 F.3d 250 (5th Cir. 2006) ................................................ 48, 52

*United States v. Williams,*
  616 F.3d 685 (7th Cir. 2010) ..................................................... 31

*Wooden v. United States,*
  142 S. Ct. 1063 (2022) .................................................9, 48, 51, 52

## Constitutional Provisions

U.S. Const. art. I, § 8, cl.3 ..............................................3, 42, 45, 46

U.S. Const. amend. I ................................................................... 18

U.S. Const. amend. II ........................................................*passim*

U.S. Const. amend. IV .................................................................. 18

U.S. Const. amend. VI ............................................................. 48, 50

U.S. Const. amend. IX .................................................................. 18

U.S. Const. amend. XIV ........................................................... 21, 22

## Statutes

18 U.S.C. § 922 ............................................................................ 31

18 U.S.C. § 922(e) ............................................................... 8, 9, 10

18 U.S.C. § 922(g) ................................................................. 4, 24

18 U.S.C. § 922(g)(1) ................................................................ *passim*

18 U.S.C. § 922(g)(8) .................................................... 26, 39

18 U.S.C. § 924(a)(8) ............................................................ *passim*

18 U.S.C. § 924(e)(1) ...................................................... 49, 51

18 U.S.C. § 3231 ................................................................... 1

18 U.S.C. § 3742(a) .............................................................. 1

28 U.S.C. § 1291 ................................................................... 1

Act of Apr. 4, 1786,
    1 N.Y. Laws 227–36 (T. Greenleaf 1792) .................................. 34

Act of Dec. 28, 1792,
    ch. 33, 6 N.H. Laws 84–92 (1917) .............................................. 34

Act of Mar. 20, 1780,
    ch. 902, 5 Pa. Stat. 144–73
    (J. Mitchell & H. Flanders comm'rs 1904) .............................. 34

Act of Oct. 3, 1961,
    Pub. L. No. 87-342, 75 Stat. 757 .............................................. 28

Bipartisan Safer Communities Act,
    Pub. L. 117-159, § 12004(c)(1), (2), 136 Stat. 1313 .................... 4

Federal Firearms Act of 1938,
    75 Cong. Ch. 850, § 2(e), 52 Stat. 1250 .................................... 28

Gun Control Act of 1968,
    Pub. L. 90-618, 82 Stat. 1213 .................................................... 28

Second Militia Act,
    § 1, 1 Stat. 271 (May 8, 1792) .................................................. 33

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) .................................................. 1

Fed. R. App. P. 32(a)(5) ................................................................. 54

Fed. R. App. P. 32(a)(6) ................................................................. 54

Fed. R. App. P. 32(a)(7)(B) ............................................................ 54

Fed. R. App. P. 32(f) ...................................................................... 54

Fed. R. Crim. P. 29 ......................................................................... 7

Fed. R. Crim. P. 52(b) .................................................................... 41

**United States Sentencing Guidelines**

U.S.S.G. § 2K2.1 cmt. n.1 ............................................................... 8

U.S.S.G. § 2K2.1(a)(3) .................................................................... 8

U.S.S.G. § 2K2.1(b)(4)(A) ............................................................... 8

U.S.S.G. § 4B1.2 cmt. n.1 ............................................................... 8

U.S.S.G. § 4B1.2(b) ........................................................................ 8

U.S.S.G. § 4B1.4 ............................................................................. 8

U.S.S.G. § 5G1.1(c)(1) .................................................................... 8

U.S.S.G. Ch.5, Pt.A (Sentencing Table) .................................... 8, 49

**Other Authorities**

Adam Winkler,
   Gunfight (2013) ......................................................................... 35

Adam Winkler,
   *Heller's Catch-22*,
   56 UCLA L. Rev. 1551 (2009) ...................................... 28, 30, 32

Horatio Marbury & William H. Crawford,
   Digest of the Laws of the State of Georgia (1802) ............... 34

Joseph G. S. Greenlee,
*The Historical Justification for Prohibiting
Dangerous Persons from Possessing Arms*,
20 Wyo. L. Rev. 249 (2020) ........................................27, 28, 30, 36

Joyce Malcolm,
TO KEEP AND BEAR ARMS: THE ORIGINS OF
AN ANGLO-AMERICAN RIGHT (1994)............................................. 32

Nelson Lund,
*The Second Amendment,* Heller*, and Originalist
Jurisprudence*, 56 UCLA L. Rev. 1343 (2009)............................ 28

Nicholas J. Johnson, et al.,
FIREARMS LAW AND THE SECOND AMENDMENT:
REGULATION, RIGHTS, AND POLICY (3d ed. 2022)................... 32, 34

Robert H. Churchill, *Gun Regulation, the Police Power,
and the Right to Keep Arms in Early America,*
25 Law & Hist. Rev. 139, 142, 143 n.11. (2007) ................... 28, 36

Royce de R. Barondes,
*The Odious Intellectual Company of Authority Restricting
Second Amendment Rights to the "Virtuous",*
25 Tex. Rev. L. & Pol. 245 (2021) ............................................... 33

Stephen P. Halbrook, THE RIGHT TO BEAR ARMS
131–35, 191–98 (2021).................................................................. 34

Thomas Herty,
DIGEST OF THE LAWS OF MARYLAND (1799) ................................. 34

## Subject Matter and Appellate Jurisdiction

**1.  Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**2.  Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas entering a judgment of criminal conviction and sentence. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). The judgment here was entered on February 13, 2023. ROA.8. Charles filed a notice of appeal four days later, on February 17, 2023. ROA.8, 193–94.

## Issues Presented for Review

1. Title 18 U.S.C. § 922(g)(1) categorially bars all convicted felons (i.e., people convicted of "a crime punishable by imprisonment for a term exceeding one year") from possessing firearms "in or affecting commerce" or which have been "shipped or transported in interstate or foreign commerce." Charles's conviction under this statute presents two issues:

A. Is § 922(g)(1) unconstitutional under the Second Amendment?

B. Does § 922(g)(1) exceed Congress' powers under the Commerce Clause? (Foreclosed.)

2. Whether the Constitution requires that the elements of the Armed Career Criminal Act enhancement—in particular, that the prior convictions were "committed on occasions different from one another"—be alleged in the indictment and either proven to a jury beyond a reasonable doubt or admitted by the defendant, under the principles articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013)? (Foreclosed.)

## Statement of the Case

Charles was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and sentenced to 235 months' imprisonment, to be followed by five years' supervised release. Charles raises three issues on appeal. First, the district court erred by denying his motion to dismiss the indictment because § 922(g)(1) is unconstitutional under the Second Amendment, facially and as applied to Charles. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Second, the statute exceeds Congress' power under the Commerce Clause. Third, the court erroneously applied the Armed Career Criminal Act (ACCA) enhancement—subjecting Charles to a higher statutory minimum penalty and Guidelines range—because the facts allegedly proving that his prior convictions were "committed on occasions different from one another" were not alleged in the indictment and proven beyond a reasonable doubt or admitted by Charles.

1.  Charles is a convicted felon. He has prior state convictions for commercial and residential burglary, felony possession of controlled substances (marijuana, Xanax, and cocaine), and being a felon in possession of a firearm. ROA.357. Here, Charles was

charged in a one-count indictment with violating § 922(g)(1) by possessing a firearm that had been "shipped and transported in interstate commerce[.]" ROA.27.[2]

This charge stemmed from Charles's arrest following a traffic stop in Odessa, Texas, for failing to stop at an intersection. ROA.174, 355. During the stop, the officer smelled alcohol and marijuana. ROA.355. When Charles exited his truck at the officer's direction, the officer saw a vape pen with a cartridge containing THC. ROA.355. A search of the truck revealed the firearm next to the seat belt on the driver's side. ROA.355. A records check indicated that the firearm was manufactured in Arizona and was stolen, and Charles had been previously convicted for felony offenses. ROA.355.

2. Charles filed a motion to dismiss the indictment, arguing that "§ 922(g)(1) is unconstitutional under the Second Amendment,

---

[2] The indictment was later corrected to strike its reference to "924(a)(2)" and to correct Charles's name. ROA.38, 85. The statutory maximum for a § 922(g)(1) offense was increased from 10 years to 15 years in late June 2022, before Charles committed the instant offense. *See* Bipartisan Safer Communities Act, Pub. L. 117-159, § 12004(c)(1), (2), 136 Stat. 1313, 1329 (striking § 922(g) from § 924(a)(2) and adding § 924(a)(8)).

both facially and as applied to [him], under the new standard announced by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)." ROA.116. He argued that the charged conduct—"possession of a firearm commonly used for self-defense"—is protected by the plain text of the Second Amendment. ROA.117; *see* ROA.120–22. The statute is facially unconstitutional, Charles argued, because the Government cannot satisfy its burden, under *Bruen*, of establishing that § 922(g)(1) is consistent the Nation's history of firearm regulation given the lack of similar founding-era laws. ROA.119–20, 123–28. And he argued that § 922(g)(1) is unconstitutional as applied to him because he has never been convicted of any violent crimes. ROA.128–30. The Government responded that the statute is supported by the Nation's historical tradition of disarming "unvirtuous" citizens. ROA.142–44.

The district court denied Charles's motion in a memorandum opinion. ROA.150–72. The court agreed that *Bruen* had abrogated the two-step means-end scrutiny that courts had used to analyze challenges to firearms laws before that decision. ROA.151–52. Applying the *Bruen* framework, the court concluded that Charles's conduct—possession of a firearm—was covered by the plain text of

the Second Amendment. ROA.153. Thus, the court recognized that, under *Bruen*, "§ 922(g)(1)'s constitutionality hinges on whether the Government can show that prohibiting felons from possessing a firearm is consistent with the Nation's historical tradition of firearm regulation." ROA.153.

On the historical question, the district court began by acknowledging that the law "prohibiting felons from possessing firearms at the federal level is less than 65 years old." ROA.155. As for founding-era laws, the court recognized that "history lacks direct examples about felons specifically[.]" ROA.155 (discussing, *inter alia*, then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 451–69 (7th Cir. 2019)).

But in the district court's view, "just because there are no straightforward examples does not mean the Court's historical inquiry stops there." ROA.157. The court went on to conclude that "[t]here is a historical basis for excluding felons from constitutional rights" and for excluding "those groups under the Second Amendment." ROA.171. In the court's view, "the people" is a term that "means only those with political rights." ROA.158. The court then pointed to laws that prohibit felons from voting and to case law limiting the First Amendment rights of speech and assembly.

ROA.158–63. Based on these "historical analogies," the court concluded that "this Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of 'the people.'" ROA.171. Reasoning that "the right under the Second Amendment should be no different," the court concluded that "§ 922(g)(1) is constitutional on its face and as applied to" Charles. ROA.171.

3. Charles pleaded not guilty and proceeded to a bench trial. He stipulated that, on July 1, 2022, he unlawfully possessed a firearm that had been manufactured in Arizona, despite knowing that, because of his prior felony conviction, he was a prohibited person. ROA.174. The Government relied on the stipulation of facts, body camera footage from the night of Charles's arrest, and a certified prior felony judgment. ROA.274, 302–04. Charles moved for a judgment of acquittal under Rule 29, which the district court denied. ROA.274–75. The court found Charles guilty as charged in the indictment. ROA.276.

4. An offense under § 922(g)(1) carries a maximum statutory penalty of 15 years, or 180 months. *See* 18 U.S.C. § 924(a)(8). However, the presentence report recommended a Sentencing Guidelines range of 188 to 235 months' imprisonment, based on a total offense

level of 31 and a criminal history category of VI.[3] ROA.366. The offense level calculation included offense level 22, based on a prior conviction for possession of Xanax with intent to deliver. ROA.356; *see also* U.S.S.G. § 2K2.1(a)(3) & cmt. n.1 (incorporating definition of "controlled substance offense" from § 4B1.2(b) & cmt. n.1). A two-level enhancement was added because the firearm was stolen, yielding an adjusted offense level of 24. ROA.356; *see also* § 2K2.1(b)(4)(A). The presentence report then applied a Chapter Four enhancement, concluding that Charles qualified as an "armed career offender" based on six predicate offenses, subjecting him to a 15-year statutory minimum penalty under 18 U.S.C. § 922(e) and offense level 33. ROA.356–57; *see also* U.S.S.G. § 4B1.4. After a two-level reduction for acceptance of responsibility, Charles's total offense level was 31. ROA.357.[4]

Charles objected to the application of the ACCA enhancement under 18 U.S.C. § 922(e) and U.S.S.G § 4B1.4 because, after *Wooden*

---

[3] The statutory maximum of 15 years should have capped any calculated Guidelines range at 180 months. *See* U.S.S.G. § 5G1.1(c)(1); Ch.5, Pt.A (Sentencing Table); 18 U.S.C. §§ 922(g)(1), 924(a)(8).

[4] Charles received 17 criminal history points, placing him in category VI, regardless of the Chapter Four enhancement. ROA.358–61.

*v. United States*, 142 S. Ct. 1063 (2022), the ACCA's requirement that the predicate offenses were "committed on occasions different from one another" must be alleged in the indictment and proven to a jury beyond reasonable doubt. ROA.371–73. Application of the ACCA enhancement violated the holdings of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. 99 (2013). Without the ACCA enhancement, Charles's total offense level would have been 22, yielding a Guidelines range of 84 to 105 months. He also would be subject to a 15-year maximum penalty. *See* §§ 922(g)(1), 924(a)(8). Charles asked for a sentence of 84 months. ROA.416–17.

The Government agreed that Charles should not be subject to the ACCA enhancement under 18 U.S.C. § 922(e). ROA.377–96.

5. At sentencing, both parties restated their agreement that Charles should not be subject to the ACCA's statutory and Guidelines enhancements because his predicate offenses were not alleged in the indictment, nor were they found beyond a reasonable doubt. ROA.284–86. The district court overruled Charles's objection to the PSR and adopted the report, statutory enhancement, and the Guidelines calculations. ROA.286–87. The court treated Charles's original request for an 84-month sentence as a motion for a variance

to 180 months, the statutory minimum penalty after application of § 922(e). ROA.287. Charles submitted letters of support from family and friends and highlighted the old age of his prior offenses and the active steps he had undertaken to live a productive life in his community. ROA.288, 419–28. The court denied the downward variance and imposed a sentence of 235 months' imprisonment, followed by five years' supervised release. ROA.187–89, 291–92.

6.  Charles appealed. ROA.193.

## Summary of the Arguments

**I.  18 U.S.C. § 922(g)(1) violates the Second Amendment because firearm possession is protected by the plain text of the Amendment and the Government cannot show a historical tradition of categorically disarming felons.**

Charles's conviction for being a felon in possession of a firearm should be reversed because the statute of conviction unconstitutionally infringes on his rights under the Second Amendment, facially and as applied to him. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed that the Second Amendment right to bear arms is not a second-class right. 142 S. Ct. 2111, 2156 (2022). The Court rejected decades of "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence. *Id.* at 2131. Instead, it announced that a modern firearm regulation's constitutionality depends only on the Second Amendment's text and historical understanding.

Under this new framework, 18 U.S.C. § 922(g)(1) violates the Second Amendment. The statute impacts the core Second Amendment right to possess a firearm for self-defense. This right belongs to all "the people" under the Constitution, including felons. And the

Government cannot meet its burden to show § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation because there is no relevant historical evidence of categorically disarming felons.

## II. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted to in this case. (Foreclosed.)

Charles preserves for further review by the Supreme Court his argument, foreclosed by circuit precedent, that § 922(g)(1) exceeds Congress' power to regulate interstate commerce because that statute permits a conviction based only on the manufacture of the firearm or ammunition outside the state in which it was possessed.

## III. Because the ACCA requirement that the defendant has at least three prior convictions "committed on occasions different from one anther" is a factual determination that increases the defendant's minimum and maximum sentences, it must be alleged in the indictment and proven to a jury beyond a reasonable doubt or admitted to by the defendant. (Foreclosed.)

Charles preserves for further review by the Supreme Court his argument, foreclosed by circuit precedent, that the ACCA's predi-

cate offenses were "committed on occasions different from one another" is a multi-factored determination that goes beyond the "fact of a prior conviction" and must be alleged in the indictment and proven beyond a reasonable doubt or admitted to by the defendant. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 570 U.S. 99, 114–16 (2013). Because Charles was sentenced under the ACCA without the "on occasions different" facts being alleged in the indictment and proven beyond a reasonable doubt or admitted to, his sentence must be vacated, and the case remanded for resentencing to no more than 15 years' imprisonment.

## Arguments and Authorities

**I. 18 U.S.C. § 922(g)(1) violates the Second Amendment because firearm possession is protected by the plain text of the Amendment and the Government cannot show a historical tradition of categorically disarming felons.**

The district court erroneously denied Charles's motion to dismiss the indictment. Section 922(g)(1) criminalizes firearm possession by any person convicted a crime punishable by more than a year. This Court has repeatedly held that 18 U.S.C. § 922(g)(1) does not violate the Second Amendment. *See, e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017). But those decisions pre-date *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which announced a new framework for analyzing Second Amendment claims. *Bruen* is an intervening Supreme Court decision that has implicitly overruled this Court's precedent because it "fundamentally change[d] the focus of the relevant analysis." *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, No. 22-915 (U.S. June 30, 2023) (cleaned up). This Court should apply *Bruen* and hold § 922(g)(1) unconstitutional both facially and as applied to Charles.

## A.  Standard of review.

The Court reviews constitutional challenges to a statute *de novo. See Rahimi*, 61 F.4th at 450 (quoting *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2011)).

## B.  *Bruen* abrogated the Second Amendment framework previously employed by circuit courts after *Heller.*

The Second Amendment to the United States Constitution mandates that a "well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008), the Supreme Court held that the Second Amendment codifies an individual right to possess firearms, the "central component" of which is self-defense. *See Bruen*, 142 S. Ct. at 2133 (citing *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims, abrogating the inquiry previously adopted by this Court and others. *See Rahimi*, 61 F.4th at 450. Under *Bruen*'s framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The Government then

"must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Only then may a court conclude that the individual's conduct falls outside of the Second Amendment's "unqualified command." *Id*.

**1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1): possession of a firearm.**

Section 922(g)(1) permanently disqualifies all felons from exercising the fundamental right to possess firearms for self-defense. The district court correctly concluded that, under the plain text of the Second Amendment, the statute is presumptively unconstitutional. ROA.153; *see Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. The plain text—"keep and bear arms"—means possessing and carrying weapons. *Heller*, 554 U.S. at 583–92. *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 142 S. Ct. at 2122. Section 922(g)(1) is a complete ban on all firearm possession, without regard to the type of firearm or the way it is used. It therefore infringes upon the core Second Amendment right to possess a firearm for self-defense. *See*

*McDonald*, 561 U.S. at 767; *see also Rahimi*, 61 F.4th at 454 (possession of rifles and pistols, weapons "in common use today," "easily falls within the purview of the Second Amendment").

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by the plain text of the Second Amendment. 142 S. Ct. at 2126. Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

## 2. Felons are among "the people" protected by the Second Amendment.

The question of a person's status, as a felon or otherwise, is irrelevant at the first step of the *Bruen* framework. The Second Amendment covers felons by recognizing that the right to keep and bear arms belongs to "the people." U.S. Const. amend. II. Because "the people" includes "all Americans," *see Heller*, 554 U.S. at 581, whether a category of person can be disarmed is a question of historical tradition, which is the Government's burden under *Bruen*.

*Heller* rejected the theory that "the people" protected by the Second Amendment were limited to a subset—*i.e.*, those in a militia. 554 U.S. at 579–81, 592–600. *Heller* explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset,"

and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81.

Like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right. *Id.* at 579–80. This is distinguishable from other Constitutional provisions for "collective" actions by "the people," like voting, which enumerate the civic exercise of powers, not rights. *Id.* Individual rights extend to "the people," or a "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of the community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Categorically excluding felons from the plain text of the Second Amendment would, therefore, endanger felons' basic protections under the First and Fourth Amendments, or else run afoul of *Bruen*'s directive that the Second Amendment is "not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality op.))

Some district courts have held that felons are excluded from "the people" protected by the Constitution, because *Heller* and *Bruen*

referenced "law-abiding" citizens in dicta. *See United States v. America v. Riley*, No. 1:22-cr-163 (RDA), 2022 WL 7610264, at *10–11 (E.D. Va. Oct. 13, 2022). This reading is inconsistent with *Rahimi*, 61 F.4th at 451–53. There, the Court reiterated *Heller*'s "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 451. It held that the Government's argument—the same one it raises here—runs "headlong into *Heller* and *Bruen*." *Id.* at 452. And it endorsed Justice Barrett's reasoning in *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), that any "law-abiding" qualifier would relate to the power to restrict a right, not the scope of the right itself. *Id.* at 451–52 (explaining that *Heller* and *Bruen* "espouse" Justice Barrett's approach from *Kanter*). The Court explained that the Government's imposition of this gloss onto the scope of the right "turns the typical way of conceptualizing constitutional rights on its head," because a person could be "readily divested" of the right—"in one day and out the next." *Rahimi*, 61 F.4th at 452–53 (citing *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)). It further noted that the "Government's proffered interpretation of 'law-abiding' admits to no true limiting principle." *Id.* at 453. For these reasons, the Court concluded "Rahimi, while hardly a model

citizen, is nonetheless among "the people entitled to the Second Amendment's guarantees, all other things equal." *Id.*[5]

And now the Third Circuit has squarely rejected the argument, explaining that the references to "law-abiding, responsible citizens" in *Heller*, *McDonald*, and *Bruen* were dicta. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc). The Government's reading would endanger other constitutional rights, be unworkably vague, and amount to prohibited deference to legislatures. *Id.* at 101–03.

Because the Second Amendment right belongs to "all Americans," *Heller*, 554 U.S. at 580–81, § 922(g)(1)'s categorical ban on an individual's possession of a firearm based on their status as a felon is presumptively unconstitutional under the plain text of the Second Amendment at the first stage of the *Bruen* analysis. Whether a

---

[5] *Rahimi* also suggested in dicta that *Heller*'s use of "'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights," as identified in its list of "longstanding prohibitions." *Id.* at 452. Reading that to exclude felons from "the people," rather than as part of the historical tradition inquiry, would conflict with that rest of *Rahimi*'s analysis. *See United States v. Sitladeen*, 64 F.3d 978, 986 (8th Cir. 2023); *United States v. Melendrez-Machado*, 2023 WL 4003508, at *3–4 (W.D. Tex. June 14, 2023).

category of people can be disarmed is, instead, a question of historical tradition, which is the Government's burden under *Bruen*.

### 3. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."

The district court correctly recognized that, because the Second Amendment presumptively protects the conduct prohibited by § 922(g)(1), the *Bruen* framework requires the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Rahimi*, 61 F.4th at 453 (quoting *Bruen*, 142 S. Ct. at 2130); *see* ROA.153. But the district court strayed from *Bruen*'s framework, which described three metrics by which the sufficiency of the historical precedent should be analyzed: temporal proximity to the founding era, similarity to the challenged restriction, and breadth. 142 S. Ct. at 2130–34, 2136, 2138.

*First*, regarding temporal proximity to the founding era, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35; emphasis in *Bruen*). "The Second Amendment was adopted in 1791; the Fourteenth in

1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years."[6] *Id*. Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id*. The Court expressed skepticism about reliance on laws passed long after the passage of the Second Amendment and explained that "to the extent later history contradicts what the text says, the text controls." *Id*. at 2137.

*Second*, the founding-era historical precedent must be comparable to the challenged regulation. How similar the historical precursors must be to the challenged law depends on the societal problem

---

[6] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court did not hold that, when considering a challenge to a federal statute, that regulations from around the passage of the Fourteenth Amendment, or 1868, would carry the same weight as those from around ratification of the Second Amendment, or 1791. *See Bruen*, 142 S. Ct. at 2137–38; *see also id*. at 2163 (Barrett, J., concurring). Indeed, *Bruen* acknowledged that 19th century evidence was secondary to that from the Nation's founding, *see id*. at 2137, and its value is likely even more limited when addressing a federal statute.

it seeks to address. *Range*, 69 F.4th at 103. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the Government must identify distinctly similar historical regulations. *Bruen*, 142 S. Ct. at 2131. The "lack of a distinctly *similar* historical regulation addressing that problem" or evidence that earlier generations addressed the societal problem through materially different means "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added). The total handgun ban in *Heller* and public-carry restriction in *Bruen* involved this type of "straightforward" historical inquiry. *Id. Bruen*'s historical analysis illustrates that "distinctly similar" means the regulations are nearly identical or meaningfully the same.

*Bruen*'s historical analysis illustrates that "distinctly similar" means the regulations are nearly identical or meaningfully the same. In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy …." *Id.* Whether a historical regulation is a proper analogue for a uniquely

modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id.* at 2132–33. But this "nuanced approach" applies only to "modern regulations that were unimaginable at the founding." *Id.* at 2132. As this Court phrased the inquiry in *Rahimi*, regarding a different provision in § 922(g), whether the historical precedents are "relevantly similar" depends on a comparison of how the laws restricted the right bear arms and why the burden was so placed, neither requiring a "historical twin" nor accepting an analogue that "remotely resembles" current law but "risks endorsing outliers that our ancestors never would have accepted." *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132–33).

*Third*, the Government must show "a *tradition* of broadly prohibiting" conduct in the manner of the challenged restriction. *Bruen*, 142 S. Ct. at 2138 (emphasis added). In other words, the founding-era historical evidence must show "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). The Government cannot "simply posit that the regulation promotes an

24

important interest." *Id.* at 2126. Nor can it rely on "outlier" historical restrictions. *Id.* at 2133, 2156. Indeed, *Bruen* "doubt[ed] that *three* colonial regulations could suffice to show a tradition[.]" *Id.* at 2142. Moreover, it is incumbent on the Government, not the Court, to provide the record of this broad historical tradition. *See id.* at 2130 n.6, 2150.

The Government cannot meet its burden here because there is no historical tradition, particularly from the founding era, of disarming all felons.

### a. The history of categorical firearms restrictions does not support disarming felons.

Reviewing historical examples of categorical restrictions on firearm possession—*i.e.*, wholesale disarmament of a particular category of person—sets the proper backdrop for the *Bruen* analysis of temporal proximity to the founding era, similarity to the challenged restriction, and breadth. While there is some limited historical evidence of disarming certain specific categories of people, none support finding § 922(g)(1) constitutional.

The Second Amendment was ratified in 1791. The codification of the right repudiated the attempted disarmament of disloyal col-

onists, much like its English precursor was a rejection of the disarmament of dissidents in Restoration-era England. *See Heller*, 554 U.S. at 592–95, 598. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *See id.* at 606–08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens," or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself.[7] *See Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting).

---

[7] In *Rahimi*, this Court rejected the use of many of these historical English and colonial era laws with regard to the restriction on possession of firearms by persons subject to protective orders. 61 F.4th at 457. It focused on the clear dissimilarities between those laws and that specific provision, including that these earlier English and colonial-era laws were targeted at preserving the social and political order generally, and not at the protection of individuals by the threat posed by another, and that other laws proffered by the government were based on criminal proceedings rather than the civil proceedings underlying § 922(g)(8)'s prohibition. *Id.*

Historical evidence from the period immediately surrounding ratification is entitled to significant weight under *Bruen*. While some categorical firearms restrictions persisted during this time, scholars have noted the period was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. *See* Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 268–70 (2020). For example, some religious dissidents in the Massachusetts Bay Colony had their rights restored after expressing contrition, and even those who engaged in an armed rebellion in Massachusetts were only subjected to a three-year prohibition on bearing arms. *Id.*

By the 19th century, "prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen," or on targeted disfavored groups like "tramps." Greenlee at 269–70. But these prohibitions, like earlier laws, did not disarm felons as a class. After a full survey of printed session laws on gun regulation, history professor Robert H. Churchill concluded: "[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Robert H.

Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 142, 143 n.11. (2007) [Churchill].

It was not until the 20th century that legislatures began to pass modern, categorical firearms bans, including on felons. *See* Greenlee at 272–75. Congress passed the first version of the modern federal firearm ban for violent felons in 1938, expanding it to include non-violent felons in 1961 and all possession in 1968.[8] State laws disarming felons were, likewise, first adopted in the early 20th century. *See* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar).

---

[8] *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

This brief review of relevant historical categorical firearms restrictions evinces a troubling tradition of disarming religious and political dissidents and targeted minority communities, but not felons. The Second Amendment is properly understood as a repudiation of many of these oppressive regulations, rather than an endorsement of such categorical restrictions. But insofar as the United States incorporated any tradition of categorical exclusion, it did not include the targeted disarmament of felons until the 20th century.

### b. There is no evidence of "distinctly similar" founding-era regulations disarming all felons.

Turning to the *Bruen* framework, the Government must provide historical examples of regulations that are "distinctly similar" to § 922(g)(1) because, as in *Heller* and *Bruen*, the restriction does not address "unprecedented societal concerns or dramatic technological changes."[9] *Bruen*, 142 S. Ct. at 2132–33; *see Range*, 69 F.4th at 103–04. Section 922(g)(1) categorically bans firearm possession by all

---

[9] Charles recognizes that this Court appeared to adopt the "relevantly similar" standard for all forms of firearm regulation, regardless of whether the societal problem was of a long-standing nature. *See Rahimi*, 61 F.4th at 455–60. The Government's examples do not meet that standard either. *See infra* Section I.B.3.c.

felons. Crime and felons have existed since the founding. So too has the presumed "societal concern" addressed by § 922(g)(1): felons possessing firearms. The Government cannot therefore rely on the "nuanced approach" of "analogical reasoning" using "relevantly similar" analogues. *See Bruen*, 142 S. Ct. at 2132. The "relevantly similar" inquiry is reserved for statutes addressing uniquely modern problems that would have been "unimaginable" at the founding. *See id.*

There are no "distinctly similar" founding-era laws demonstrating a tradition of broadly prohibiting firearm possession by felons. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (noting scholars have not been able to identify any founding-era laws disarming all felons); *see also* Winkler at 1563. The earliest firearm restrictions for felons in America were passed in the 20th century. *See, e.g.*, Greenlee at 272–75. The modern statutes that dispossess felons of firearms, including § 922(g)(1), bear "little resemblance to laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012). Reliance on the passage of

§ 922 itself to support its own historical tradition is logically circular and ignores *Bruen*'s skepticism of 20th century historical evidence. *See Bruen*, 142 S. Ct. at 2137, 2154 n.28; *Range*, 69 F.4th at 104.

Before *Bruen*, courts often acknowledged the absence of founding-era felony restrictions. Yet they concluded that § 922(g)(1) was constitutional by relying on *Heller*'s dicta that prohibitions on felon firearm possession were "longstanding," or by applying means-end scrutiny that *Bruen* swept aside. *See, e.g., Booker*, 644 F.3d at 24 (noting that *Heller* did not cast doubt on longstanding prohibitions on firearm possession by certain individuals, including felons, which are presumptively lawful)); *Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019) (same); *see also United States v. Williams*, 616 F.3d 685, 691–94 (7th Cir. 2010) (holding that § 922(g)(1) survives Second Amendment challenge under intermediate scrutiny).

This reasoning is irreconcilable with *Bruen*'s framework, which expressly rejected the use of means-end scrutiny. *Bruen*, 142 S. Ct. at 2127–30. Moreover, the "longstanding prohibitions" language in *Heller* is dicta, and courts have cautioned against reliance on it. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *see also*

Winkler at 1567. *Bruen* requires the Government to provide "distinctly similar" historical examples from the founding era to prove that a restriction on the Second Amendment right is consistent with the Nation's traditions. *See generally Bruen*, 142 S. Ct. 2111. *Heller* never suggested that these prohibitions would be exempt from historical scrutiny. To the contrary, it explained "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before use." *Heller*, 554 U.S. at 635. *Bruen* likewise acknowledged that *Heller* had not yet provided historical support for these prohibitions. *See Bruen*, 142 S. Ct. at 2128 (noting its prior caution that it was not undertaking an "exhaustive historical analysis … of the full scope of the Second Amendment").

There is, however, considerable evidence that felons were included among those citizens to whom the Second Amendment was expressly directed.

At the founding, the *right* to bear arms was also deeply connected to the historical *duty* to bear arms. *See* Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 1–10, 138–40 (1994); Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 219–22

(3d ed. 2022) [Johnson]. Indeed, the Second Amendment codified an individual right, but the prefatory clause clarifies that the purpose of that right was to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. This duty to bear arms was reflected in federal and state laws *requiring* most citizens to keep firearms as part of militia service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792).[10] These laws "exempted" certain classes of people, but not felons. *Id.* § 2, 1 Stat. 272; *cf.* Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021) (finding no evidence that those with criminal convictions were excluded from militia duties or firearm ownership).[11] The colonies generally required

_____

[10] Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Second Militia Act, § 1. The Act further required that "every citizen so enrolled … shall, within six months thereafter, provide himself with a good musket or fire-lock, a sufficient bayonet and belt," and other related items like ammunition. *Id*.

[11] Similar contemporaneous state militia statutes also did not to exempt felons or those under indictment. *See, e.g.*, Thomas Herty, DIGEST

even indentured servants—often convicted criminals—to be armed for militia service. *See* Johnson 185, 191–92. Countless colonial laws similarly required citizens to keep and carry firearms to and from church, as part of patrol duties, to aid against attacks by Native Americans, or otherwise to defend themselves and their community. *See id.* at 189–91; Stephen P. Halbrook, THE RIGHT TO BEAR ARMS 131–35, 191–98 (2021).

It follows that, while "the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, __F. Supp. 3d __, No. 4:21-cv-1245-MTP, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022). Disarming felons would have made little sense to the founders because it would have effectively relieved them of a civic duty. Despite passing myriad other

_____

OF THE LAWS OF MARYLAND 367–73 (1799); Act of Dec. 28, 1792, ch. 33, 6 N.H. Laws 84–92 (1917); Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T. Greenleaf 1792); Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73 (J. Mitchell & H. Flanders comm'rs 1904); Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 350 (1802); *cf. United States v. Miller*, 307 U.S. 174, 178–82 (1939) (discussing militia laws); Johnson 177–89 (in depth discussion about arms requirements for militia service in each colony).

gun restrictions—early versions of gun registrations, safe storage laws, restrictions on types of firearms, and disarmament of Native Americans, enslaved persons, and religious minorities—the founders never proposed barring felons from receiving guns or disarming them. *See* Adam Winkler, GUNFIGHT 113–18, 286–87 (2013) (detailing Revolutionary era gun laws and noting absence of restrictions like those from the 20th century). Not only were felons not disarmed at the founding; they were usually required to own firearms.

The absence of founding-era laws specifically disarming felons forecloses the Government's ability to show "distinctly similar historical regulation[s]" like § 922(g)(1).

### c. The Government cannot satisfy the "relevantly similar" inquiry either.

In *Rahimi*, this Court appeared to adopt the "relevantly similar" standard for all forms of firearm regulation, regardless of whether the societal problem was of a long-standing nature. *See Rahimi*, 61 F.4th at 455–60. Even if the Court applied this more "nuanced approach," which should be reserved under *Bruen* for statutes addressing unprecedented modern problems, there is no evidence of "relevantly similar" firearms restrictions to § 922(g)(1) from the founding era. Courts that have upheld § 922(g)(1) since *Bruen* have

largely eschewed the requirement to show specific, similar histori-
cal regulations. Instead, many have relied on general arguments by
the Government that § 922(g)(1) is consistent with traditions of dis-
arming other "unvirtuous" citizens. This is inconsistent with *Bruen*.

Even prior to *Bruen*, some courts relied on a purported tradition
of disarming "unvirtuous" citizens to support modern felon dis-
armament laws. *See Medina*, 913 F.3d at 159 (collecting cases).
Scholars have, however, noted the absence of historical support for
this "virtuous citizen" theory. *See* Greenlee at 275–83. The earliest
articles promoting the theory fail to cite any historical evidence. *See*
*id*. Rather, as described above, historical categorical disarmament
was generally limited to disempowered minority communities—
*e.g.*, slaves and Indians—and those who evidenced disloyalty to the
government. *See id.* at 261–65; Churchill at 156–61. Many of these
types of categorical restrictions were rejected by the Second Amend-
ment, but even those of arguable historical relevance do not "impose
a comparable burden on the right" and are not "comparably justi-
fied" to § 922(g)(1)'s categorical disarmament of felons. *See Bruen*,
142 S. Ct. at 2133 (explaining metrics of comparing "relevantly sim-
ilar" analogues). This Court has likewise expressed skepticism
about reliance on these types of laws, which disarmed groups of

36

people based on the repugnant historical view that they were excluded from "the people" protected by the Constitution. *Rahimi*, 61 F.4th at 457.

*Bruen* also expressly rejected the type of overly generalized reasoning employed under the "virtuous citizen" theory. In *Bruen*, the state of New York relied on a select few disparate historical restrictions on public carry of firearms for specific purposes or in specific sensitive places to establish a more general principle of limiting all public carry. 142 S. Ct. at 2135, 2142–50. Throughout *Bruen*, the Court reasoned that the respondents had "define[d] the category … far too broadly" and rejected the extrapolation of a broad tradition from a few narrow historical restrictions. *See id.* at 2134, 2150, 2156. The same is true here. Historical evidence of disarming slaves, Indians, and political opponents cannot be generalized to encompass all "unvirtuous" people—a term that mischaracterizes those historical categories and which would encompass considerably more categories than felons. The term lacks a limiting principle and is defined "far too broadly." *See id.* at 2134; *cf. Medina*, 913 F.3d at 159–60 (rejecting the similar "dangerousness standard" as too "amorphous ... to delineate the scope of the Second Amendment"). It also invites deference to legislatures to define the "unvirtuous"

people and reliance on something like means-end scrutiny for courts to review that definition. Both were repudiated by *Bruen*. 142 S. Ct. at 2131.

That the Founders may have identified and considered the possibility of disarming felons, but ultimately did not, itself illustrates that § 922(g)(1) is unconstitutional. *See id.* at 2131. Even if this Court were to rely on representations about the Founders' views about the scope of the Second Amendment—and *Heller* warned it was "dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right[,]" 554 U.S. at 603— the fact that the Amendment does not include proposed language limiting the right for certain categories of people is evidence that the Founders rejected this construction. *See Kanter*, 919 F.3d at 454–56 (Barrett, J., dissenting) (describing rejected proposals from the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions, which could have limited those covered by the Second Amendment).

This Court rejected a similar argument proffered by the Government in *Rahimi*, offering as a historical analogue proposals at various state ratification conventions which were not adopted ultimately in the text of the Second Amendment. *See Rahimi*, 61 F.4th

at 457 (stating that proposals of various founding fathers, ultimately not adopted, "might somewhat illuminate the scope of firearms rights at the time of ratification, but they cannot counter the Second Amendment text, or serve as an analogue for § 922(g)(8) because, inter alia, they were not enacted").

The "virtuous citizen" theory therefore lacks historical support and is insufficient to demonstrate an historical tradition of regulations "relevantly similar" to § 922(g)(1), as required by *Bruen*.

* * *

The Government cannot show historical evidence distinctly or relevantly similar to § 922(g)(1) that would illustrate a tradition of categorically disarming felons. Thus, it cannot overcome the presumption that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2126; *Range*, 69 F.4th at 106. *Bruen*'s new analytical framework plainly applies to § 922(g)(1) and renders the statute violative of the Second Amendment. The Court should therefore reverse Charles's § 922(g)(1) conviction.

## C. Under the same framework, § 922(g)(1) violates the Second Amendment as applied to felons like Charles.

In an as-applied *Bruen* challenge, as in a facial challenge, the Government must show that felons like Charles were historically

disarmed. *See Range*, 69 F.4th at 106 ("Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights."). This the Government has not and cannot do.

As discussed above, *supra* Section I.B., there is no historical evidence to support the proposition that felons, dangerous or otherwise, were disarmed at the founding. *See United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023) ("The government's violent-and-dangerous argument is also out of sequence, as the government still had not (and has not today) proven the predicate question: that there is a historical tradition of disarming either the violent or the dangerous."). Courts are skeptical of subjecting § 922(g)(1) challenges to this type of ambiguous and unworkable dangerousness test. *See, e.g., id.* at *28; *Range*, 69 F.4th at 104 n.9 ("We need not decide [whether dangerousness or violence is the touchstone] today because the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not.").

Because the Government cannot show the requisite historical tradition, the Court should alternatively hold § 922(g)(1) unconstitutional as applied to Charles.

## II. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress' power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted in this case. (Foreclosed.)

### A. Standard of review.

The Court reviews this issue, raised for the first time on appeal, using the plain-error standard of review. *United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020); *see* Fed. R. Crim. P. 52(b). A conviction under an unconstitutional statute meets the plain error standard. *See United States v. Knowles*, 29 F.3d 947, 951–52 (5th Cir. 1994). That said, Charles acknowledges that this issue is foreclosed. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (per curiam) (unpublished) (summarizing precedent), *petition for cert. filed*, No. 22-6853 (U.S. Feb. 21, 2023). He raises it here for possible further review by the Supreme Court.

## B. 18 U.S.C. § 922(g)(1) exceeds Congress' power to regulate interstate and foreign commerce.

Article I, § 8 of the United States Constitution provides: "Congress shall have power … To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes …." In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court established the test for the scope of Congress' power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Lopez*, 514 U.S. at 559. *Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." 431 U.S. 563, 575 (1977).

A fair reading of *Scarborough* suggests that the case was concerned solely with statutory interpretation and did not purport to resolve any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of re-

hearing en banc). This Court has adhered to the view that *Scarborough*'s "minimal nexus" is sufficient both to prove guilt under 18 U.S.C. § 922(g)(1) and to bring any subsequent act of firearm possession within Congress' power to regulate. *See, e.g., United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional reading of *Scarborough. See Alderman v. United States*, 562 U.S. 1163, 1166 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez* ...."); *see also United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance[.]"); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part) ("[T]he precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale of" *Lopez*.). Judge Ho's opinion dissenting from denial of rehearing en banc in *Seekins*, 52 F.4th at 988–92, is the most recent and thorough objection to the established view.

If *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of citizens. *See Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress' power. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Roberts, C.J.) ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.") (hereinafter "*NFIB*").

This unlimited power renders 18 U.S.C. § 922(g)(1) facially unconstitutional. In *NFIB*, Chief Justice Roberts noted that "[a]s expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching '*activity*.'" 567 U.S. at 551 (emphasis added). He reasoned that this limitation of Commerce Clause power to "activities" is a "distinction between doing something and doing

nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555 (quoting *Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in judgment)). Four other Justices echoed Chief Justice Roberts's sentiment regarding the Commerce Clause analysis, stating that Congress could only regulate "*activity* affecting commerce[.]" *NFIB*, 567 U.S. at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

Here, 18 U.S.C. § 922(g)(1) does not require that Charles's possession of the gun was an economic activity. This ought to be fatal to the conviction. *See NFIB*, 567 U.S. at 556–57 (Roberts, C.J.); *see also United States v. Morrison*, 529 U.S. 598, 613 (2000) (noting that "thus far in our Nation's history," Supreme Court has upheld intrastate regulation under Commerce Clause only where regulated activity is economic in nature). Because § 922(g)(1) criminalizes all possession, it sweeps too broadly.

Charles's case illustrates how this Court's precedent removes any limitation on Congress' commerce power. His indictment alleged that he "possess[ed]" a firearm that "ha[d] been shipped and transported in interstate commerce[.]" ROA.27. The sole evidence offered at trial to support the commerce element was a stipulation

that the firearm had been manufactured in Arizona. ROA.174. The Government offered no proof that Charles had traveled in interstate commerce to bring the firearms to Texas, nor even proof that Charles had purchased the firearms from any vendor participating in interstate commerce.

Charles thus was convicted under § 922(g)(1) without evidence that he was "currently engaged" in the gun market at the time of his arrest and without evidence showing how recently he came to possess the gun. *See NFIB*, 567 U.S. at 556, 557 (Roberts, C.J.) ("An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense."). Because § 922(g)(1) does not regulate the use of interstate commerce or its channels, or things in interstate commerce, it does not fall within the category of activities justifiably regulated by the federal government under the Commerce Clause. The statute is, therefore, unconstitutional.

The statute has been construed to require only that a firearm have traveled in interstate commerce at some previous time. *See Scarborough*, 431 U.S. at 575. If it cannot be construed to require commercial activity of some kind by the defendant—something more substantial than mere possession of an item that may have

46

crossed state lines years ago—it then contains no jurisdictional element sufficient to bring it within the terms of Congressional power. In the absence of such a jurisdictional element, the Supreme Court has found federal criminal statutes falling substantially outside the Commerce power to be unconstitutional, without pausing to consider whether the particular conduct of the defendant might have affected commerce. *See Lopez*, 514 U.S. at 561; *United States v. Morrison*, 529 U.S. 598, 607 (2000). In other words, without such an element, comparable statutes have been found facially unconstitutional.

Charles concedes that this argument was rejected in *Alcantar*, 733 F.3d at 145–46, among other cases, but raises it to preserve the issue for possible further review.

**III.** **Because the ACCA's requirement that the defendant has at least three prior convictions "committed on occasions different from one another" is a factual determination that increases the defendant's minimum and maximum sentences, it must be alleged in the indictment and proven to a jury beyond a reasonable doubt or admitted to by the defendant. (Foreclosed).**

Charles pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). At sentencing, the district

court determined that Charles had at least three prior violent felony or serious drug offense convictions that were "committed on occasions different from one another," and sentenced him under the ACCA. Because the question whether prior convictions were committed on occasions different from one another is a multi-factored inquiry, *Wooden v. United States*, 142 S. Ct. 1063, 1067, 1070–71 (2002), the facts should have been alleged in the indictment and proven beyond a reasonable doubt or admitted to by Charles, *see Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 570 U.S. 99, 114–16 (2013). Because they were not, Charles's sentence must be vacated, and the case remanded for resentencing.

## A. Standard of review.

Application of the Sixth Amendment to the ACCA is a question of law that this Court reviews *de novo*. *United States v. White*, 465 F.3d 250, 254 (5th Cir. 2006).

## B. Because Charles's sentence was increased based on a fact not alleged in the indictment or proven to a jury beyond a reasonable doubt, it must be vacated.

Under the ACCA, a defendant convicted of illegally possessing a firearm, in violation of 18 U.S.C. § 922(g)(1), is subject to an increased punishment if he has three or more prior convictions for a

violent felony or serious drug offense "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). At the time of Charles's offense, a violation of § 922(g)(1) was punishable by a maximum sentence of 15 years' imprisonment. 18 U.S.C. § 924(a)(8). With the ACCA enhancement, that punishment increases to a mandatory minimum sentence of 15 years' imprisonment up to life. 18 U.S.C. § 924(e)(1).

Charles was convicted by bench trial of being a felon in possession of a firearm, under § 922(g)(1). ROA.276. He was facing a statutory maximum sentence of 15 years' imprisonment. His advisory Guidelines range was 84 to 105 months' imprisonment. *See* U.S.S.G. Ch.5, Pt.A. Because the district court determined that the ACCA applied, however, Charles faced a mandatory minimum sentence of 15 years' imprisonment and a maximum of life. ROA.287, 366. His advisory Guidelines range increased to 188 to 235 months' imprisonment. ROA.287. The court sentenced him to 235 months. ROA.292. The ACCA's requirement that Charles have at least three prior violent felony or serious drug offense convictions committed on occasions different from one another was not alleged in the indictment and proven beyond a reasonable doubt. Nor did Charles admit that the ACCA enhancement applied.

The Supreme Court held in *Apprendi v. New Jersey*, that, under the Sixth Amendment, facts that increase the maximum sentence must be proved to the jury beyond a reasonable doubt. 530 U.S. 466, 490 (2000). Later, in *Alleyne v. United States*, the Supreme Court applied *Apprendi*'s rule to mandatory minimum sentences, holding that any fact that produces a higher sentencing range—not just a sentence above the mandatory maximum—must be alleged in the indictment and proven to a jury beyond a reasonable doubt. 570 U.S. 99, 110–11, 114–16 (2013).

The *Apprendi/Alleyne* rule has a narrow exception, however. It does not apply to "the fact of a prior conviction." This exception stems from an earlier decision, *Almendarez-Torres v. United States*, in which the Supreme Court upheld a statutory provision that authorized an enhanced penalty based on a prior conviction. 523 U.S. 224, 226 (1998). The Court justified the enhancement on the ground that the prior conviction was a sentencing factor, not an element of the offense, and the enhancement did not violate due process even if the prior conviction increased the statutory maximum. *Id*. at 235.

The ACCA increases a defendant's minimum and maximum sentences based not only on the fact of a prior conviction, or three prior

convictions, but also on the relationship between those convictions—they must have been "committed on occasions different from one another." § 924(e)(1). In its recent decision, *Wooden v. United States*, the Supreme Court held that the ACCA's "on occasions different from one another" determination turns on a "multi-factored" inquiry that considers time, place, intervening events, and "the character and relationship of the offenses." 142 S. Ct. at 1067, 1070–71.

These considerations fall outside of the "fact of a prior conviction" and look to facts underlying the prior conviction. The fact of the conviction is limited to the existence of the conviction and the elements of the offense of conviction. *Mathis v. United States*, 579 U.S. 500, 511–12 (2016). A sentencing judge may not "go beyond identifying the crime of conviction to explore the manner in which the defendant committed that crime." *Id*. at 511. That "would raise serious Sixth Amendment concerns." *Id*. It would also raise due process concerns as court records of facts that are not elements are prone to error "precisely because their proof is unnecessary." *Id*. at 512.

Accordingly, the rule of *Apprendi/Alleyne* applies and the facts allegedly supporting the "occasions different from one another" determination must be alleged in the indictment and proven to a jury beyond a reasonable doubt or admitted by the defendant. Indeed, two amicus in *Wooden* raised this issue to the Supreme Court. The Supreme Court refused to the address the issue because it had not been raised by either of the parties. 142 S. Ct. at 1068 n.3. Justice Gorsuch noted, however, "there is little doubt [the Court] will have to do so soon." *Id*. at 1087 n.7. (Gorsuch, J., concurring).

This Court has held that, because the ACCA is merely a sentencing enhancement provision, the Constitution does not require "a jury finding on the existence of the three previous felony convictions required for enhancement." *White*, 465 F.3d at 254 (citing *United States v. Stone*, 306 F.3d 241, 243 (5th Cir. 2002)); *see also United States v. Eddins*, 451 F. App'x 395, 397 (5th Cir. 2011) (noting that *White* forecloses this argument).

Charles concedes that this argument was rejected in *United States v. Valencia*, 66 F.4th 1032 (5th Cir. 2023), among other cases, but raises it to preserve the issue for possible further review.

## Conclusion

For these reasons, the Court should reverse the district court's denial of his motion to dismiss his indictment and vacate his conviction.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Kristin L. Davidson
KRISTIN L. DAVIDSON
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,227 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Kristin L. Davidson
KRISTIN L. DAVIDSON
*Attorney for Defendant-Appellant*

Dated: August 2, 2023