# No. 23-50131

# In the United States Court of Appeals for the Fifth Circuit

---

**United States of America,**

Plaintiff-Appellee,

v.

**Raymond Charles, Jr.,**

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Western District of Texas

---

**APPELLEE'S BRIEF FOR THE UNITED STATES**

---

Jaime Esparza
United States Attorney

Lauren Tanner Bradley
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
(512) 370-1294

## Recommendation on Oral Argument

This case presents the same issue as *United States v. Collette*, No. 22-51062, which presents the first preserved, post-*Bruen* challenge to § 922(g)(1) in this Circuit. *Collette* is fully briefed, and this Court tentatively calendared it for oral argument the week of October 2, 2023. This Court then sua sponte placed *Collette* in abeyance pending the Supreme Court's decision in *United States v. Rahimi*, which is currently being briefed and will be argued during the upcoming term.[1] Accordingly, the government recommends that, if oral argument is deemed necessary, it be postponed until after the United States Supreme Court issues a decision in *Rahimi*, which, like this appeal, will address a Second Amendment challenge to a provision of 18 U.S.C. § 922.

The remaining issues are foreclosed by this Court's precedents, and oral argument would not aid the decisional process. *See* Fed. R. App. P. 34(a)(2)(B) & (C).

---

[1] The government is aware of at least two additional cases raising the same issue as *Collette* and pending appeal in this Court. *United States v. Grinage,* No. 23-50261 (government-appellee's brief due September 29); *United States v. Bullock*, No. 23-60408 (government-appellant's brief due October 4).

# Table of Contents

Recommendation on Oral Argument ................................................. i

Table of Contents ................................................................. ii

Table of Authorities ............................................................. iv

Jurisdiction ...................................................................... 1

Statement of the Issues ........................................................... 1

Statement of the Casesupr ........................................................ 2

Summary of the Argument ........................................................ 5

Standard of Review ............................................................... 6

Argument ......................................................................... 7

    I.    Charles's conviction under § 922(g)(1) comports with the Second Amendment .............................................. 7

        A.    This Court's binding precedent forecloses Charles's Second Amendment challenge to § 922(g)(1). ................. 7

        B.    Section 922(g)(1) is constitutional under *Bruen*'s framework. ................................................. 13

            1.    Section 922(g)(1) is presumptively lawful because the Second Amendment's plain text does not cover convicted felons. ............... 14

            2.    Section 922(g)(1) squares with the nation's historical tradition of gun regulation .................... 22

                a.    The government need only show a historical analogue, not a historical twin. ........ 22

                b.    Section 922(g)(1) is analogous to historical laws allowing capital punishment and estate forfeiture for felony convictions. .......... 26

       c.   Section 922(g)(1) is analogous to historical laws disarming dangerous or untrustworthy people...........................................................31

    C.   At the least, § 922(g)(1) is constitutional as applied to Charles.......................................................................41

II.   Precedent forecloses Charles's claim that § 922(g)(1) exceeds Congress's power under the Commerce Clause.........44

III.  Precedent forecloses Charles's claim that the elements of a sentence enhancement under the ACCA must be alleged in the indictment and either proven to a jury beyond a reasonable doubt or admitted by the defendant. ....................44

Conclusion .........................................................................44

Certificate of Compliance ...................................................46

# Table of Authorities

## **Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018) ........................................................................22

*Apprendi v. New Jersey*,
  530 U.S. 466, 490 (2000)................................................................4, 6

*Barrett v. United States*,
  423 U.S. 212 (1976) ............................................................................37

*Baze v. Rees*,
  553 U.S. 35 (2008) ..............................................................................26

*Buchanan v. Alexander*,
  919 F.3d 847 (5th Cir. 2019) ............................................................42

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) .......................................................................27

*Chandris, Inc. v. Latsis*,
  515 U.S. 347 (1995) ............................................................................22

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...................................................................8, 9, 15

*Folajtar v. Attorney General*,
  980 F.3d 897 (3d Cir. 2020).........................................................26, 43

*Harmelin v. Michigan*,
  501 U.S. 957 (1991) ............................................................................43

*Hollis v. Lynch*,
  827 F.3d 436 (5th Cir. 2016) ............................................................21

*In re Bonvillian Marine Serv., Inc.*,
  19 F.4th 787 (5th Cir. 2021) ..........................................................7, 12

*Leonard v. United States*,
  2023 WL 2456042 (S.D. Fla. Mar. 10, 2023) ...................................42

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) .......................................................................8, 15

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ...................................................passim

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012) .......................................................passim

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ..............................................................passim

*Range v. Attorney General*,
   69 F.4th 96 (3d Cir. 2023) ........................................................ 13, 25

*Robertson v. Baldwin*,
   165 U.S. 275 (1897) ...................................................................14

*Tennessee v. Garner*,
   471 U.S. 1 (1985)........................................................................27

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) .........................................................16

*United States v. Anderson*,
   559 F.3d 348 (5th Cir. 2009) ............................................................ 8

*United States v. Banuelos*,
   640 F. Supp. 3d 716 (W.D. Tex. 2022) ................................................37

*United States v. Barber*,
   2023 WL 1073667 (E.D. Tex. Jan. 27, 2023) .....................................42

*United States v. Belin*,
   2023 WL 2354900 (D. Mass. Mar. 2, 2023)......................................31

*United States v. Bena*,
   664 F.3d 1180 (8th Cir. 2011).............................................................36

*United States v. Black*,
   2023 WL 122920 (W.D. La. Jan. 6, 2023) ........................................18

*United States v. Carpio-Leon*,
   701 F.3d 974 (4th Cir. 2012) ............................................................35

*United States v. Collette*,
   630 F. Supp. 3d 841 (W.D. Tex. 2022) ................................................ 3

*United States v. Coombes*,
   629 F. Supp. 3d 1149 (N.D. Okla. 2022) ...........................................37

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023) .............................................12, 19, 25, 39

*United States v. Darrington*,
    351 F.3d 632 (5th Cir. 2003) ................................................. 7, 8, 9, 12

*United States v. DaSilva*,
    2022 WL 17242870 (M.D. Penn. Nov. 23, 2022) ........................ 15, 21

*United States v. Davis*,
    487 F.3d 282 (5th Cir. 2007) ............................................................44

*United States v. Everist*,
    368 F.3d 517 (5th Cir. 2004) ............................................................. 8

*United States v. Gonzalez*,
    2022 WL 4376074 (7th Cir. Sept. 22, 2022).....................................43

*United States v. Grinage*,
    2022 WL 17420390 (W.D. Tex. Dec. 5, 2022) ........................... 10, 36

*United States v. Hale*,
    2023 WL 3866865 (E.D. La. June 6, 2023) ......................................10

*United States v. Hill*,
    629 F. Supp. 3d (S.D. Cal. 2022) ....................................................43

*United States v. Holden*,
    70 F.4th 1015, 1018 (7th Cir. 2023) ................................................42

*United States v. Howard*,
    766 F.3d 414 (5th Cir. 2014) ............................................................. 6

*United States v. Jackson*,
    69 F.4th 495 (8th Cir. 2023) ......................................................passim

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022)..........................................................15

*United States v. Jordan*,
    2023 WL 157789 (W.D. Tex. Jan. 11, 2023) ....................................10

*United States v. Kelly*,
    2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) .............................23

*United States v. Leontaritis*,
    977 F.3d 447 (5th Cir. 2020) ............................................................. 6

*United States v. Mares*,
    402 F.3d 511 (5th Cir. 2005) ............................................................. 8

*United States v. Mason,*
   2023 WL 2589395 (N.D. Tex. Mar. 21, 2023) ...................................10

*United States v. Massey,*
   849 F.3d 262 (5th Cir. 2017) ................................................. 8, 10, 44

*United States v. Matthews,*
   312 F.3d 652 (5th Cir. 2002) ............................................................ 6

*United States v. McGinnis,*
   956 F.3d 747 (5th Cir. 2020) ..........................................................41

*United States v. Mendez,*
   2023 WL 3097243 (S.D. Tex. Apr. 26, 2023) .................................10

*United States v. Perryman,*
   965 F.3d 424 (5th Cir. 2020) ..........................................................44

*United States v. Rene E.,*
   583 F.3d 8 (1st Cir. 2009) ...............................................................36

*United States v. Rice,*
   2023 WL 2560836 (N.D. Ind. Mar. 17, 2023) .................................30

*United States v. Robinson,*
   367 F.3d 278 (5th Cir. 2004) ............................................................ 6

*United States v. Scroggins,*
   599 F.3d 433 (5th Cir. 2010) ............................................................ 8

*United States v. Sitladeen,*
   64 F.4th 978 (8th Cir. 2023) ...........................................................10

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ..........................................................34

*United States v. Thompson,*
   2023 WL 3159617 (E.D. La. Apr. 27, 2023) ...................................10

*United States v. Valencia,*
   66 F.4th 1032 (5th Cir. 2023) .........................................................44

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) .........................................................................14

*United States v. Vongxay,*
   594 F.3d 1111 (9th Cir. 2010) .........................................................20

*United States v. Washington*,
  2023 WL 5275013 (5th Cir. Aug. 16, 2023) .......................................12

*United States v. Yancey*,
  621 F.3d 681 (7th Cir. 2010) ............................................................35

*United States v. Young*,
  2022 WL 16829260 (W.D. Pa. Nov. 7, 2022) ....................................43

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ..........................................................................41

## Statutes

1777 Pa. Laws 63 ...................................................................................33

18 U.S.C. § 3231 ..................................................................................... 1

18 U.S.C. § 3742 ..................................................................................... 1

18 U.S.C. § 922 .............................................................................passim

18 U.S.C. § 924 ..................................................................................... 3

28 U.S.C. § 1291 ................................................................................... 1

An Act for the Punishment of Certain Crimes Against the United
  States, 1 Stat. 112 (1790) ................................................................27

La. Stat. § 40:1379.3 ............................................................................18

Miss. Code. Ann. § 45-9-101 ...............................................................18

Tex. Gov't Code § 411.172 ..................................................................18

## Other Authorities

Acts and Laws of His Majesty's Province of New Hampshire in New
  England; with Sundry Acts of Parliament (1771) (1701 statute) ........32

Acts and Laws of The English Colony of Rhode Island and
  Providence-Plantations in New-England in America (1767) ..............30

Acts and Resolves, Public and Private, of the Province of the
  Massachusetts Bay (1869) (1692 statute) ...........................................32

Acts and Resolves, Public and Private, of the Province of the
  Massachusetts Bay 545 (1878) ..........................................................30

William Blackstone, Commentaries on the Laws of England 95 (1st
    ed. 1769)..........................................................................................26

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to
    Keep Arms in Early America: The Legal Context of the Second
    Amendment*, 25 Law & Hist. Rev. 139 (2007) ......................................33

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277
    (2014) ...............................................................................................27

Collection of All Such Acts of the General Assembly of Virginia, of a
    Public and Permanent Nature, as Are Now in Force (1794) (1786
    statute) ...........................................................................................32

A Compilation of the Statutes of Tennessee of a General and
    Permanent Nature, from the Commencement of the Government to
    the Present Time (1836) (1801 statute)..............................................32

Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866)................................35

Thomas M. Cooley, A Treatise on the Constitutional Limitations
    Which Rest Upon the Legislative Power of the States of the
    American Union (1st ed. 1868)...........................................................35

Saul Cornell, *"Don't Know Much About History": The Current Crisis in
    Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) .......36

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early
    American Origins of Gun Control*,
    73 Fordham L. Rev. 487 (2004)..........................................................33

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
    Dangerous Persons from Possessing Firearms*,
    20 Wyo. L. Rev. 249 (2020) ..............................................................31

William Waller Hening, Statutes at Large; Being a Collection of All
    the Laws of Virginia, from the First Session of the Legislature
    302 (1821)........................................................................................28

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law &
    Contemp. Probs. 143 (1986) ..............................................................36

The Laws of Maryland, With the Charter, The Bill of Rights, the
    Constitution of the State, and its Alterations, The Declaration of
    Independence, and the Constitution of the United States, and its
    Amendments (1811)..........................................................................29

Laws of the State of New York Passed at the Sessions of the
    Legislature (1785–1788) (1886)................................................... 27, 28

Laws of the State of North Carolina, including the Titles of Such
    Statutes and Parts of Statutes of Great Britain as Are in Force in
    Said State (1821) (1741 statute) ........................................................ 32

Joyce Lee Malcolm, To Keep and Bear Arms 140-41 (1994)................. 33

Bernard Schwarz, The Bill of Rights: A Documentary History (1971) . 34

S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937) ..................................... 37

Statutes at Large of Pennsylvania from 1682 to 1801 (1896)................. 29

George Webb, The Office and Authority of a Justice of Peace (1736)... 32

## Jurisdiction

This appeal arises from a final judgment in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The defendant filed a timely notice of appeal. (ROA.193.) This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## Statement of the Issues

Charles was convicted of violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms.

**1. Second Amendment.** Was Charles's conviction under § 922(g)(1) valid under the Second Amendment, either because

(a)  this Court's still-binding precedent has held that § 922(g)(1) comports with the Second Amendment or

(b)  the framework introduced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), still allows Congress to bar felons like Charles from having guns?

**2. Commerce Clause.** Does precedent foreclose Charles's claim that § 922(g)(1) exceeds Congress's power under the Commerce Clause, as he concedes?

**3. Armed Career Criminal Act.** Does precedent foreclose Charles's claim that elements of a sentence enhancement under the Armed Career Criminal Act must be alleged in the indictment and either proven to a jury beyond a reasonable doubt or admitted by the defendant?

## Statement of the Case

**1.** Charles is a convicted felon. He has a litany of prior Arkansas state convictions for, among other things, commercial and residential burglary, felony possession of controlled substances with intent to deliver (marijuana, Xanax, and cocaine), and being a felon in possession of a firearm. (ROA.357-61.)

Last year, officers in Odessa, Texas, saw Charles speeding and failing to stop at an intersection. (ROA.355.) The speed limit was 35 miles per hour, but the pursuing officer had to drive over 70 miles an hour to make the stop. (ROA.355.) During the stop, officers smelled marijuana in the car and alcohol on Charles's breath. (ROA.355.) His eyes were also red and bloodshot. (ROA.355.) A search ensued, and officers found a clear plastic baggie containing marijuana in the front dash ashtray and an Ooze vape pen in the driver-side door with a full vape cartridge containing Tetrahydrocannabinols (THC). (ROA.355.)

Charles told officers he had a firearm in the truck. (ROA.355.) They found the gun—a 45-caliber, semi-automatic pistol—next to the seat belt on the driver's side. (ROA.355.) The firearm was loaded with eight rounds in the magazine, and a record check confirmed the firearm had been stolen. (ROA.355.) A criminal record check revealed Charles's prior felony convictions. (ROA.355.)

**2.** Charles was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ROA.27.) He moved to dismiss the

indictment, claiming that § 922(g)(1) violates the Second Amendment under the framework set out in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (ROA.116-31.) The district court, noting "this Nation['s] . . . longstanding history of excluding felons from the rights of 'the people'" referred to by the Second Amendment's text, denied Charles's motion. (ROA.172.) In reaching this conclusion, the court referred to its opinion in *United States v. Collette*, 630 F. Supp. 3d 841 (W.D. Tex. 2022), which similarly held that § 922(g)(1) is constitutional both facially and as applied based on this country's historical tradition of excluding felons from "the people."[2] (ROA.171-72.)

**3.** After a stipulated bench trial, the district court found Charles guilty of unlawful firearm possession by a felon. (ROA.276, 187.) The presentence report found that Charles was an armed career criminal subject to an enhanced sentence under 18 U.S.C. § 924(e) because he had at least three prior convictions for a violent felony or serious drug offense, or both, which were committed on different occasions. (ROA.356-57.) These qualifying convictions included

> (1) a conviction for commercial burglary in Arkansas City, Arkansas;
>
> (2) two convictions for residential burglary in Star City, Arkansas;

---

[2] That decision is also on appeal before this Court in *United States v. Collette*, No. 22-51062. As addressed in the Recommendation on Oral Argument, *Collette* presents the first preserved, post-*Bruen* challenge to § 922(g)(1) in this Circuit; it is fully briefed and has been placed in abeyance pending the Supreme Court's decision in *Rahimi*.

3

(3) a conviction for residential burglary in Pine Bluff, Arkansas;

(4) a conviction for possession of cocaine with intent to deliver in Fort Smith, Arkansas;

(5) a conviction for possession of Xanax with intent to deliver and conspiracy to deliver cocaine in Fort Smith, Arkansas (considered as one conviction for enhancement purposes because they occurred on the same day); and

(6) a conviction for possession of marijuana with intent to deliver in Fort Smith, Arkansas. (ROA.357.)

Charles objected to the enhancement, arguing that his "Indictment did not allege these prior convictions as 'on occasions different from one another,' nor were these facts established beyond a reasonable doubt during the bench trial." (ROA.369, 371-72, 284 (citing *United States v. Wooden*, 142 S. Ct. 1063 (2022), and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).) The district court overruled the objection, adopted the PSR, and sentenced Charles to a within-guidelines-range sentence of 235 months imprisonment. (ROA.286-87, 292, 188.)

## Summary of the Argument

**I.** Charles's conviction under § 922(g)(1) comports with the Second Amendment.

**A.** This Court's precedent forecloses Charles's claim. This Court has repeatedly held that § 922(g)(1) does not violate the Second Amendment. To reach that conclusion, this Court determined the Second Amendment's original scope based on the right to bear arms "as historically understood in this country." Although *Bruen* rejected means-end scrutiny and clarified that the proper Second Amendment framework is textual and historical, it did not overrule this Court's § 922(g)(1) precedents—let alone unequivocally. This Court remains bound by them.

**B.** In any event, § 922(g)(1) is constitutional under *Bruen*. *Bruen* held that if a law burdens conduct covered by the Second Amendment's plain text, then the law must square with the nation's historical tradition of gun regulation. Section 922(g)(1) burdens no conduct covered by the Second Amendment's plain text because convicted felons are not law-abiding citizens and therefore fall outside "the people" to which the Second Amendment was understood at the Founding to include. And § 922(g)(1) squares with the nation's historical tradition of gun regulation because it is analogous to historical laws (1) allowing capital punishment and estate forfeiture for felony convictions and (2) disarming groups that legislatures determined were dangerous or untrustworthy.

**C.** Even if the Second Amendment extends to some convicted felons, § 922(g)(1) is constitutional as applied to Charles. Even the broadest view of the right to bear arms recognizes that the government can seek to keep guns away from violent or otherwise dangerous felons. Charles's criminal record shows a long history of dangerous conduct, including burglary, drug trafficking, and illegal gun possession.

**II.** As Charles concedes, this Court's precedent forecloses his Commerce Clause argument.

**III.** Charles similarly concedes that this Court's precedent forecloses his sentencing argument that the elements of a sentence enhancement under the Armed Career Criminal Act must be alleged in the indictment and either proven to a jury beyond a reasonable doubt or admitted by the defendant.

## Standard of Review

This Court "review[s] preserved challenges to the constitutionality of a criminal statute *de novo*." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

This Court reviews a preserved *Apprendi* challenge de novo and for harmless error. *See* Fed. R. Crim. P. 52(a); *United States v. Leontaritis*, 977 F.3d 447, 450 (5th Cir. 2020); *United States v. Robinson*, 367 F.3d 278, 285 (5th Cir. 2004); *United States v. Matthews*, 312 F.3d 652, 665 (5th Cir. 2002).

6

**Argument**

**I.    Charles's conviction under § 922(g)(1) comports with the Second Amendment.**

**A.    This Court's binding precedent forecloses Charles's Second Amendment challenge to § 922(g)(1).**

This Court's precedent forecloses Charles's claim that § 922(g)(1) violates the Second Amendment, and no higher authority has overruled it. Under the rule of orderliness, "one panel of [this] court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (quotation marks omitted). "This rule is strict and rigidly applied." *Id.* "Thus, for a Supreme Court decision to change [this] Circuit's law, it must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *Id.* (brackets and quotation marks omitted).

This Court first held that § 922(g)(1) does not violate the Second Amendment in *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003). It explained that although the amendment protects individual rights, "that does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id.* at 633-34. The Court concluded

7

"that legislative prohibitions on the ownership of firearms by felons are not considered infringements on the historically understood right to bear arms protected by the Second Amendment." *Id.* at 634; *see also United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (same).

This Court has repeatedly recognized that *Darrington* and *Everist* foreclose Second Amendment challenges to § 922(g)(1). *See United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Mares*, 402 F.3d 511, 516 (5th Cir. 2005). In *Anderson*, this Court "reaffirm[ed] *Darrington* and the constitutionality of § 922(g)" after the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See Anderson*, 559 F.3d at 352. It pointed to the Supreme Court's assurance that it was casting no "doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 352 n.6 (quoting *Heller*, 554 U.S. at 626); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s assurances about "such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons'").

*Bruen* did not unequivocally overrule these precedents. *Bruen* did not address felon-in-possession laws or other status-based gun restrictions, a point emphasized in opinions joined by six Justices. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."); *id.* at 2162 (Kavanaugh, J., concurring)

8

(reiterating *Heller*'s and *McDonald*'s assurances that felons can be prohib-
ited from possessing guns); *id.* at 2189 (Breyer, J., dissenting) ("I under-
stand the Court's opinion today to cast no doubt on" *Heller*'s statement
that felon-in-possession laws are presumptively lawful). The Court held
that means-end scrutiny—applied at "step two" of many circuits' pre-
*Bruen* frameworks—was "inconsistent with *Heller*'s historical approach."
*Id.* at 2129. It thus struck down New York's licensing law amounting to a
total ban of public carry, subject only to case-by-case executive discre-
tion. *Id.* at 2123. But the Court explained that the circuits' "step one"—
at which they "ascertain[ed] the original scope of the right based on its
historical meaning"—was "broadly consistent with *Heller*." *Id.* at 2126-
27.

   *Bruen* did not disturb this Court's § 922(g)(1) precedents because—
consistent with *Heller* (and the circuits' pre-*Bruen* "step one")—those
precedents rest on the Second Amendment's historical scope, not means–
end scrutiny. To repeat, *Darrington* rested on the Second Amendment's
scope "as historically understood in this country." *See* 351 F.3d at 633-34.
Indeed, this Court decided *Darrington* nine years before it adopted a two-
step test applying means-end scrutiny at "step two," in a case addressing
age-based restrictions, not a felon-in-possession law. *See Nat'l Rifle Ass'n
of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d
185, 192 (5th Cir. 2012). And even after this Court adopted means-end
scrutiny for some gun laws, it reaffirmed that § 922(g)(1) is constitutional

9

without reference to means-end scrutiny or interest balancing. *See Massey*, 849 F.3d at 265. So nothing in *Bruen* casts doubt on this Court's § 922(g)(1) precedents.[3]

Nor has this Court applied *Bruen* to felon-in-possession laws. In *United States v. Rahimi*, this Court struck down § 922(g)(8), which

---

[3] Many district courts applying this circuit's law have agreed. One explained that this Court's pre-*Bruen* § 922(g)(1) precedents, "like *Heller*, relied on text and history." *United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *3 (W.D. Tex. Dec. 5, 2022), *appeal docketed*, No. 23-50261 (Apr. 17, 2023). And since "[n]othing in the *Bruen* decision calls into question the precedential effect of Fifth Circuit decisions finding § 922(g)(1) constitutional based on the Second Amendment's text and history … , § 922(g)(1) remains constitutional under binding Fifth Circuit authority." *Id.*; *see also United States v. Hale*, No. CR 22-131, 2023 WL 3866865, at *2 (E.D. La. June 6, 2023) (holding that neither "*Bruen* nor *Rahimi* upset this [Court's] longstanding precedent" upholding § 922(g)(1)); *United States v. Thompson*, No. CR 22-173, 2023 WL 3159617, at *2 (E.D. La. Apr. 27, 2023) ("[A] review of *Bruen*, *Heller*, and pre-*Bruen* Fifth Circuit precedent bearing on the constitutionality of § 922(g)(1) makes plain that this Court is in no position to declare that *Bruen* overturned otherwise controlling caselaw."); *United States v. Mendez*, No. 2:22-CR-00656, 2023 WL 3097243, at *2 (S.D. Tex. Apr. 26, 2023) ("The Court remains bound by this Circuit's precedent on Section 922(g)(1)."); *United States v. Mason*, No. 4:23-CR-0036-P, 2023 WL 2589395, at *2 (N.D. Tex. Mar. 21, 2023) ("[T]his Court need not conduct an exhaustive evaluation of Defendant's Second Amendment argument because this Court remains bound by circuit precedent as to § 922(g)(1)."); *United States v. Jordan*, No. EP-22-CR-01140-DCG-1, 2023 WL 157789, at *7 (W.D. Tex. Jan. 11, 2023) (holding that "the Fifth Circuit's pre-*Bruen* decisions upholding Section 922(g)(1)" remain binding). *Cf. United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (holding that *Bruen* did not disturb circuit precedent foreclosing Second Amendment challenges to § 922(g)(5)).

prohibits gun possession by people subject to some civil domestic-violence orders. 61 F.4th 443, 460-61 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023). *Rahimi* held that *Bruen* made "obsolete" this Court's precedent upholding § 922(g)(8) because it had "expressly appl[ied] means-end scrutiny," which *Bruen* "expressly repudiated." *Id.* at 450-51. The government thus conceded that § 922(g)(8) called for fresh analysis of the Second Amendment's text and history. *Id.* But *Rahimi*'s holding does not apply to pre-*Bruen* precedent resting on the Second Amendment's historical understanding, not means-end scrutiny.[4]

More importantly, *Rahimi* focused narrowly on civil orders and did not question the textual or historical basis for disarming felons. Indeed, *Rahimi* quoted *Heller*'s statement that it cast no "doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 452. *Heller* and *Bruen*, this Court explained, counted felons among the groups "historically [] stripped of their Second Amendment rights, *i.e.*, groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Id.*; *see also id.* at 464 (Ho, J., concurring) ("The government can impose various restrictions on the rights of dangerous convicted felons, consistent with our Nation's history and traditions—and that includes the right to keep and bear arms."); *United States v.*

---

[4] Regardless, the government maintains that *Rahimi* was wrongly decided, and the Supreme Court has granted the government's certiorari petition challenging it. *See* 143 S. Ct. 2688.

*Washington*, 2023 WL 5275013, at *1 (5th Cir. Aug. 16, 2023) (unpublished) (recognizing that "*Rahimi* suggests that *Bruen*'s logic may not extend to" § 922(g)(1)).

Nor did this Court address a felon-in-possession law in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023). *Daniels*'s "narrow[]" holding was that the federal prohibition of gun possession by unlawful drug users, 18 U.S.C. § 922(g)(3), violates the Second Amendment as applied to a marijuana user. *Id.* at 355. *Daniels* too did not question the textual or historical basis for disarming felons. This Court instead repeated its observation from *Rahimi* that *Heller* and *Bruen* recognized that "the mentally ill and felons … were historically stripped of their Second Amendment rights." *Id.* at 343 (quotation marks omitted).

In sum, this Court has long held that § 922(g)(1) is consistent "with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Darrington*, 351 F.3d at 633-34. Though *Bruen* repudiated means-end scrutiny of gun laws, it did not disturb—let alone unequivocally overrule—holdings like *Darrington* based on the Second Amendment's historical understanding. Rather, *Bruen* endorsed holdings like *Darrington* as "broadly consistent with *Heller*." 142 S. Ct. at 2126-27. This Court's § 922(g)(1) precedents

12

are therefore binding absent intervening en banc or Supreme Court authority.[5]

### B. Section 922(g)(1) is constitutional under *Bruen*'s framework.

Charles's claim fails even without regard to this Court's pre-*Bruen* precedent. *Bruen* held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30. Applying that framework here, § 922(g)(1) does not violate the Second Amendment. The Second Amendment codified a preexisting right to bear arms that covered only law-abiding, responsible citizens, and therefore excluded convicted felons. So, as the Supreme Court has stated, felon-in-possession laws are presumptively lawful. But even if felons fall within the amendment's textual scope, § 922(g)(1) squares with the nation's historical tradition of gun regulation.

---

[5] This Court's precedent would thus foreclose the result reached in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), where the majority concluded that § 922(g)(1) violates the Second Amendment as applied to someone convicted of making a false statement to obtain food stamps. Anyway, *Range*'s holding was "narrow," addressing only the specific criminal record before the court; it did not cast doubt on § 922(g)(1) more generally. 69 F.4th at 106; *see also id.* at 109 (Ambro, J., concurring) ("[T]he Government's failure to carry its burden in this case does not spell doom for § 922(g)(1)."). And even that narrow holding was wrong for the reasons set forth by the dissenting judges. *See id.* at 113 (Shwartz, J., dissenting); *id.* at 116 (Krause, J., dissenting); *id.* at 138 (Roth, J., dissenting).

**1.  Section 922(g)(1) is presumptively lawful because the Second Amendment's plain text does not cover convicted felons.**

The Second Amendment does not cover all citizens. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). So the right to bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634-35.

The Second Amendment's scope thus excludes those who did not enjoy the preexisting right, no matter whether they are part of "the people" as the Constitution uses that phrase. *See Heller*, 554 U.S. at 580 (explaining that all six provisions mentioning "the people" "unambiguously refer[] to all members of the political community"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (defining "the people" as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). "[T]he history of the 'pre-existing right' of 'the people' to 'keep and bear arms,' codified in the Second Amendment, demonstrates that the Second Amendment right extended, and continues to extend, 'to some categories of individuals, but not others.'" *United*

*States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870, at *7 (M.D. Pa. Nov. 23, 2022) (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022)). So "even individuals who are indisputably part of 'the people' … might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id.* (quoting *Jimenez-Shilon*, 34 F.4th at 1045-46).

*Heller* explained that the Second Amendment codified a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786. Gun restrictions on felons and the mentally ill are presumptively lawful because those groups of people are not law-abiding, responsible citizens and therefore did not enjoy the preexisting right to bear arms. As a result, the Second Amendment's textual scope still excludes them today.

*Bruen* confirmed this reading of *Heller*. Echoing *Heller*, the Court explicitly, repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible

citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (reading *Heller* as "conclud[ing] that [the Second Amendment] protects the 'law-abiding, responsible' citizen's possession of arms for the 'lawful purpose of self-defense'"). None of those references suggest that the Second Amendment curbs laws restricting the gun rights of non-law-abiding citizens like convicted felons.

Three more aspects of the *Bruen* opinion confirm that a person's status as non-law-abiding counts at *Bruen*'s first, textual step:

First, the *Bruen* opinion itself addressed whether the petitioners were law-abiding in the section (III.A) addressing the Second Amendment's textual scope, not the section (III.B) addressing historical tradition. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute that the petitioners there—"two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id*. (citing *Heller*, 554 U.S. at 580). The Second Amendment covered them *because* they were undisputedly law-abiding, responsible citizens. *See id.*

Second, reading *Bruen* and *Heller* together shows that whether a law is presumptively constitutional depends on whom the law prevents from bearing arms. As noted, *Heller* established that laws disarming "felons and the mentally ill"—and some other gun regulations—are "presumptively lawful." 554 U.S. at 626 & n.26. In contrast, *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," so that laws prohibiting the conduct are presumptively *unlawful*. 142 S. Ct. at 2126. *Bruen*'s presumptive protection could be "[i]n keeping with" *Heller*'s presumptive lawfulness, *see id.*, only if *Heller*'s "presumptively lawful" regulations burden no conduct covered by the amendment's text. In other words, at least some status-based laws disarming people considered non-law-abiding or irresponsible—"felons and the mentally ill"—are "presumptively lawful" *because* the Second Amendment's text excludes those people at *Bruen*'s first step.

Third, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2162 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective,

17

and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted). And many (if not all) states' standards disqualify felons or anyone prohibited by federal law from having a gun.[6] By indicating that those regimes remain broadly constitutional (unless abused, as when "lengthy wait times … or exorbitant fees deny ordinary citizens their right to public carry"), the Court strongly implied that the Second Amendment's text excludes people (like felons) considered non-law-abiding. Otherwise, the 43 states' many objective criteria disqualifying applicants for licenses—and thus preventing them from bearing arms—would be presumptively unlawful and could survive only through case-by-case, historical inquiries. The Court suggested no such thing.

In *Bruen*'s wake, "[t]he majority of courts have concluded that the [Second Amendment] right extends only to law-abiding citizens." *United States v. Black*, No. CR 22-133-01, 2023 WL 122920, at *3 (W.D. La. Jan. 6, 2023) (collecting cases). This Court has confirmed that at least some non-law-abiding citizens—including convicted felons—fall outside "the

---

[6] *See, e.g.*, La. Stat. § 40:1379.3(C)(10) (requiring that the applicant "[n]ot have been convicted of, have entered a plea of guilty or nolo contendere to, or not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"); Miss. Code. Ann. § 45-9-101(d) (requiring that the applicant "[i]s not ineligible to possess a firearm by virtue of having been convicted of a felony in a court of this state, of any other state, or of the United States"); Tex. Gov't Code § 411.172(a)(3) (requiring that the applicant "has not been convicted of a felony").

political community within the amendment's scope." *See Rahimi*, 61 F.4th at 452 (quotation marks omitted). Although *Rahimi* held that the defendant (who was subject to a civil domestic-violence order) was part of the political community with Second Amendment rights, that was because he "was not a convicted felon or otherwise subject to another longstanding prohibition on the possession of firearms *that would have excluded him*." *Id.* (cleaned up; emphasis added) (citing *Heller*, 554 U.S. at 626-27); *see also id.* at 464 (Ho., J., concurring) ("The Supreme Court has … made clear that our Nation's history and traditions include 'longstanding prohibitions on the possession of firearms by felons'—and that such measures are 'presumptively lawful.'" (quoting *Heller*, 554 U.S. at 626 & n.26)). Likewise, in *Daniels*, this Court, citing *Rahimi*, explained that "the mentally ill and felons, people who were historically 'stripped of their Second Amendment rights," fall outside "the Second Amendment's ambit." *Daniels*, 77 F.4th at 343 ("Because Daniels is not a felon or mentally ill, *Rahimi*'s treatment of the 'law-abiding' moniker suggests that he has presumptive Second Amendment rights as well.").

Some courts held the same before *Bruen* in textual analyses that *Bruen* deemed "broadly consistent" with Supreme Court precedent. *See* 142 S. Ct. at 2127. For instance, *Medina v. Whitaker* rejected a challenge to § 922(g)(1) as applied to a nonviolent felon. 913 F.3d 152, 157-58 (D.C. Cir. 2019). To determine "the public understanding of the right" when the Second Amendment was ratified, the court considered the

severe punishments felons then faced, as well as evidence that the founders understood the right to exclude "those who were not (or could not be) virtuous members of the community." *Id.* at 158-59. The court held that felons—violent or not—"are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 154; *accord United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that "felons are categorically different from the individuals who have a fundamental right to bear arms").

A straightforward application of these principles excludes Charles from the Second Amendment's coverage. When Charles was found with a loaded, stolen firearm in his possession, he undisputedly had several felony convictions, including a commercial burglary conviction, three residential burglary convictions, four felony drug trafficking convictions, and one prior conviction for unlawful firearm possession. (ROA.357-61.) Those convictions "remove[d] him from the political community within the amendment's scope" and placed him in a "group[] whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *See Rahimi*, 61 F.4th at 452 (quoting *Heller*, 554 U.S. at 627 n.26).

These repeated statements by the Supreme Court, this Court, and other courts disprove Charles's argument that convicted felons fall within "the people" described by the Second Amendment (Def. Br. 17-21). For one thing, the Supreme Court said exactly the opposite in *Heller* when it called "prohibitions on the possession of firearms by felons"

20

"presumptively lawful." 554 U.S. at 626-27 & n.26. Charles's argument also wrongly focuses on how the Constitution uses the phrase "the people" as a term of art, not on the scope of the preexisting right that the Second Amendment codifies. The political community that enjoyed the preexisting right excluded felons, so felons "may be prohibited from possessing firearms" even if they "are indisputably part of 'the people.'" *See DaSilva*, 2022 WL 17242870, at *7 (quoting *Jimenez-Shilon*, 34 F.4th at 1045-46). Charles dismisses as dicta the Supreme Court's statements that Second Amendment rights extend only to law-abiding citizens and not felons. (Def. Br. 18-19.) But this Court is "generally bound by Supreme Court dicta." *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016); *see also Campaign for S. Equal. v. Bryant*, 791 F.3d 625, 627 n.1 (5th Cir. 2015) (explaining that while this Court is not bound by its own dicta, "dicta of the Supreme Court are, of course, another matter" (quotation marks omitted)).

In sum, *Bruen*'s first analytical step resolves this case: Convicted felons like Charles fall outside the community protected by the Second Amendment's plain text. So, as the Supreme Court has stated, felon-in-possession laws are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. This Court should affirm on this ground.

## 2.    Section 922(g)(1) squares with the nation's historical tradition of gun regulation.

In any event, § 922(g)(1) is consistent with the right to bear arms because it squares with historical tradition. *Bruen*'s historical test demands only a relevant historical analogue—a law showing that the founding generation would have seen § 922(g)(1) as permissible. That test presents a question of law, which this Court can answer in view of all possible analogues.[7] This Court should affirm Charles's conviction because § 922(g)(1) is analogous to historical laws (1) allowing capital punishment and estate forfeiture for felony convictions and (2) disarming groups that legislatures determined were dangerous or untrustworthy.

### a.    The government need only show a historical analogue, not a historical twin.

When comparing modern and historical gun laws, courts must often "reason[] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2132 (quotation marks omitted). *Bruen* gave no "exhaustive survey of the features

---

[7] The "interpretation" of a constitutional or statutory provision "is a question of law," *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995), even when interpretation involves historical work. What is more, as the Supreme Court explained in discussing the common-law rule that treated questions of foreign law as questions of fact, treating *Bruen*'s historical inquiry as a question of fact would produce "a number of undesirable practical consequences." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (quotation marks omitted). The relevant historical material would have to be established in each case "in accordance with the rules of evidence," and appellate review would be "deferential and limited to the record made in the trial court." *Id.* As a result, the meaning of the Second Amendment would vary from case to case depending on the record the parties compiled in the district court.

that render regulations relevantly similar" but noted "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, the central inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

"[A]nalogical reasoning," the Court continued, is not "a regulatory straitjacket." *Id.* at 2133. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*; *see also Nat'l Rifle*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). That is "because a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* A court conducting *Bruen*'s historical inquiry must not just "consider

23

what earlier legislatures did, but imagine what they could have imagined." *Id.*

*Bruen*'s historical test does not split into (1) a "straightforward" approach for laws "address[ing] a general societal problem that has persisted since the 18th century," which requires a "distinctly similar" historical law; and (2) a more "nuanced approach" for laws addressing "unprecedented societal concerns," which calls for analogical reasoning. (Def. Br. 22-24, 35 (quotation marks omitted).) As Charles concedes (Def. Br. 29 n.9), this Court declined to adopt that rigid bifurcation of "approaches" in *Rahimi*. *See* 61 F.4th at 455-60.

And for good reason. *Bruen* did not set "distinctly similar" as a governing standard or rule of decision but merely offered guidance on how courts "may" approach cases depending on their context. *See Bruen*, 142 S. Ct. at 2132. The Court used the phrase "distinctly similar" just once, and even then, described "the lack of a distinctly similar historical regulation" only as "relevant evidence"—not as dispositive. *See id.* at 2131. Charles insists that *Bruen* reserved analogical reasoning for laws that "were unimaginable at the founding" because they "implicat[e] unprecedented societal concerns or dramatic technological changes." (Def. Br. 23-24, 30.) But *Bruen*'s own historical analysis explicitly reasoned by analogy even though the challenged New York licensing law addressed a persistent societal problem. *See, e.g.*, *id.* at 2131, 2145, 2153.

24

To the extent the panel applied such a bifurcated approach in *Daniels*, it did so in contravention of *Rahimi* and *Bruen*, and that decision remains subject to further review. *See Daniels*, 77 F.4th at 343. In any event, *Daniels* applied the "relevantly similar" framework to analyze the constitutionality of § 922(g)(3), where "intoxication generally was a persistent social problem," but "the Founding generation had no occasion to consider the relationship between firearms and intoxication via cannabis" and no familiarity with "the modern drug trade." *Id.* at 343-44. Moreover, "*Bruen* observed that historical analogies must be more flexible when a contemporary regulation implicates unprecedented societal concerns or dramatic technological changes." *Range*, 69 F.4th at 120 (Krause, J., dissenting). "Section 922(g)(1) is such a regulation, as the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel were unknown at the Founding." *Id*.

Finally, *Bruen* did not incorporate into any rule of decision a requirement that the government "show a governmental practice [that] has been open, widespread, and unchallenged since the early days of the Republic." (Def. Br. 24 (quotation marks omitted).) In the context of noting the *limits* on the relevance of post-enactment history, the Court observed that such a practice would be *relevant* to its "interpretation of an ambiguous constitutional provision." *Bruen*, 142 S. Ct. 2137 (quotation marks omitted). But it did not suggest that such a practice was a necessary

condition to upholding a modern law. Charles also takes *Bruen*'s "broadly prohibiting" language out of context (Def. Br. 24, 30); the Court was not setting the historical-tradition rule of decision but describing the challenged licensing law, *see* 142 S. Ct. at 2138.

### b. Section 922(g)(1) is analogous to historical laws allowing capital punishment and estate forfeiture for felony convictions.

Permanent disarmament imposes a relatively slight burden compared to the penalties felons historically faced. Felonies have long been considered "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted).

Capital punishment and estate forfeiture were also commonly authorized punishments in the American colonies and then the states. *See Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, The Death Penalty: An American History 23 (2002)); *see*

*also Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (same); *Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). The First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). Many American jurisdictions through the end of the 1700s also authorized complete forfeiture of a felon's estate. *See United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (observing that "early legislatures … authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for nonviolent offenses involving deceit and wrongful taking of property." (collecting statutes and scholarship)); Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-76 (2014) (collecting statutes).

A few examples demonstrate the severe historical consequences of a felony conviction. In 1788, just three years before the Second Amendment's ratification, New York passed a law imposing the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting. 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-65 (1886). The act established that every person convicted of an offense making the person

27

"liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" that the person possessed "at the time of any such offence committed, or at any time after." *Id.* at 666. For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed had previously lacked "a punishment sufficiently exemplary annexed thereto." 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony,

28

shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both. For example, a 1700 Pennsylvania law provided that any person convicted of "wilfully [sic] firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of

Death" and that any person knowingly passing a counterfeit bill be im-
prisoned, pay double damages, and "forfeit the remaining Part of his Es-
tate (if any he hath) both real and personal, to and for the Use of the
Colony." Acts and Laws of The English Colony of Rhode Island and
Providence-Plantations in New-England in America 33-34 (1767). And a
1750 Massachusetts law provided that rioters who refused to disperse
"shall forfeit all their lands and tenements, goods and chattles [sic]," in
addition to receiving 39 lashes and one year's imprisonment. 3 Acts and
Resolves, Public and Private, of the Province of the Massachusetts Bay
545 (1878).

     These severe penalties imposed comparable (indeed, far greater)
burdens to § 922(g)(1)'s gun prohibition, and the burdens were compara-
bly justified by the need to adequately punish felons, deter reoffending,
and protect society from those proven untrustworthy to follow the law.
*See Bruen*, 142 S. Ct. at 2133. "[I]t is difficult to conclude that the public,
in 1791, would have understood someone facing death and estate forfei-
ture to be within the scope of those entitled to possess arms." *Medina*,
913 F.3d at 158. Thus, "tradition and history" show that "those con-
victed of felonies are not among those entitled to possess arms" under
the Second Amendment. *Id.* at 158, 160; *see also United States v. Rice*, No.
3:22-CR-36 JD, 2023 WL 2560836, at *8-9 (N.D. Ind. Mar. 17, 2023)
(finding that "historical laws which authorized capital punishment and
estate forfeiture for persons convicted of felonies" are "sufficiently

30

analogous" to § 922(g)(1) to overcome a *Bruen* challenge); *United States v. Belin*, No. 21-CR-10040-RWZ, 2023 WL 2354900, at *2 (D. Mass. Mar. 2, 2023) (concluding that "tradition and history in the eighteenth century were consistent with felon disarmament" since "felonies were punishable by death").

### c. Section 922(g)(1) is analogous to historical laws disarming dangerous or untrustworthy people.

Section 922(g)(1)'s prohibition of gun possession is also analogous to historical laws disarming dangerous or untrustworthy people. "History shows that the right to keep and bear arms was subject to restrictions that included prohibitions on [gun] possession by certain groups of people." *Jackson*, 69 F.4th at 502. "[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history).

The American colonies inherited that tradition. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145.

31

Those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies or states had codified the common-law prohibition on going armed offensively and authorized the arrest of those who did so. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131-32 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute). Three of those statutes (all but North Carolina's) required forfeiture of the offender's weapons. Other states soon followed. *See, e.g.*, A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99-100 (1836) (1801 statute).

Also "[n]oteworthy" among "revolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons." *Nat'l Rifle*, 700 F.3d at 200; *see Jackson*, 69 F.4th at 502-03 (collecting colonial statutes disarming "Native Americans" and "[r]eligious

minorities").[8] During the revolutionary war, "several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Nat'l Rifle*, 700 F.3d at 200; *see, e.g.*, Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479; Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63; Act of May 28, 1777, ch. 3 (Va.), *reprinted in* 9 William Waller Hening, The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619, at 281-83 (1821). *See also Jackson*, 69 F.4th at 502-03 (collecting statutes); *Medina*, 913 F.3d at 159 (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140-41 (1994).

Accounts of the ratification debates confirm the Founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty

---

[8] "While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503.

generally." *Nat'l Rifle*, 700 F.3d at 200. "*Heller* identified ... as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604); *see also Jackson*, 69 F.4th at 503 (citing the Dissent of the Minority as historical support for § 922(g)(1)). That report recognized that the government could disarm potentially dangerous or untrustworthy people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Skoien*, 614 F.3d at 640 (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution recommending "that the said Constitution be never construed to authorize Congress ... to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674-75, 681 (emphasis added). Although those precursors used different language from the Second Amendment (Def. Br. 26, 38), they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-05.

The understanding that dangerous or untrustworthy people could be disarmed persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866). A circular issued by the Freedman's Bureau around the same time explained that a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 142 S. Ct. at 2152 (citation omitted). Thomas Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, explained that some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) (quoting *Vongxay*, 594 F.3d at 1118 (collecting scholarly sources)); *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (same). The Second Amendment thus incorporates "a common-law tradition that permits

restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15-16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner.") (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002)).

These sources establish a longstanding historical tradition of imposing categorical gun restrictions on those deemed dangerous or untrustworthy. As the Eighth Circuit recently explained,

> legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons.

*Jackson*, 69 F.4th at 505. A large and growing number of district courts have likewise rejected *Bruen* challenges to § 922(g)(1) based on the same historical tradition.[9]

_____

[9] *See, e.g.*, *Grinage*, 2022 WL 17420390, at *7 ("[T]he Government meets its burden by establishing § 922(g)(1) is firmly rooted in this Nation's

This Court should hold the same. Section 922(g)(1) is "relevantly similar" to these historical precursors under the "two metrics" *Bruen* offered: "how and why the regulations burden" Second Amendment rights. *See* 142 S. Ct. at 2132-33. As to "how" § 922(g)(1) works, like these precursors, it uses an objective criterion—the existence of a felony conviction—to categorically restrict a specific group's gun rights. As to "why," § 922(g)(1) seeks to promote public safety by "keep[ing] firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976) (discussing the legislative intent of the 1968 Gun Control Act, which created the modern-day prohibition in § 922(g)(1)); *see also Jackson*, 69 F.4th at 505 ("Congress prohibited categories of presumptively dangerous persons from transporting or receiving firearms because they posed an unacceptable risk of dangerousness." (cleaned up)); S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937) (explaining that predecessor legislation sought to protect the public by "eliminat[ing] the guns from the crooks' hands, while interfering as little as possible with the law-abiding citizen"). Thus,

---

historical tradition, at common law, of excluding felons from the people protected by the Second Amendment." (quotation marks omitted)); *United States v. Coombes*, 629 F. Supp. 3d 1149, 1160 (N.D. Okla. 2022) ("[Section] 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation and the statute is not unconstitutional." (quotation marks omitted)); *United States v. Banuelos*, 640 F. Supp. 3d 716, 723 (W.D. Tex. 2022) ("Section 922(g)(1) is consistent with the well-established historical tradition of tying the right to bear arms to the concept of a virtuous citizenry." (quotation marks omitted)).

§ 922(g)(1) squares with the tradition of "prohibit[ing] possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Jackson*, 69 F.4th at 504.

The panel's decision in *Rahimi* would not compel a contrary conclusion even if its reasoning endures the Supreme Court's review next term. (Def. Br. 26 n.7, 38-39.) While the panel in *Rahimi* rejected the government's analogy between § 922(g)(8) and some historical laws disarming dangerous people, it did so based on features particular to § 922(g)(8). *See* 61 F.4th at 456-57. First off, the panel "question[ed]" the analogy because some historical dangerousness laws—like laws disarming Native Americans and politically disloyal citizens—targeted groups excluded from the political community in the first place (unlike those subject to civil domestic-violence orders, in the panel's view). *Id.* at 457. That observation makes dangerousness laws more analogous to § 922(g)(1), not less, given the *Rahimi* panel's own recognition that a felony conviction excludes the convict "from the political community within the amendment's scope." *See id.* at 452. The panel also reasoned that dangerousness laws rested on different justifications than § 922(g)(8) because they meant to preserve "political and social order," not to protect "an identified person from the threat of domestic gun abuse." *See id.* at 457. That observation too makes dangerousness laws more analogous to § 922(g)(1), not

38

less, since § 922(g)(1) likewise aims to protect society generally from armed criminals, not to protect an identified victim from domestic abuse.

The panel decision in *Daniels*—which also remains subject to further review—points in the same direction. Although this Court rejected the historical examples of danger-based disarmament as analogous to § 922(g)(3)'s application to a marijuana user, *Daniels*, 77 F.4th at 350, it emphasized the "narrowness" of its holding and disclaimed any suggestion "that a robust Second Amendment is incompatible with other reasonable gun regulations." *Id.* at 355. Indeed, this Court noted "an undeniable throughline in all those historical sources: Founding-era governments took guns away from persons perceived to be dangerous," *id.* at 352, and it acknowledged that felons were among those "people who were historically 'stripped of their Second Amendment rights.'" *Id.* at 343 (quoting *Rahimi*, 61 F.4th at 452).

Nor can Charles overcome the historical record supporting categorical gun restrictions like § 922(g)(1) by citing laws addressing militia service just because those laws did not *explicitly exempt* convicted felons. (Def. Br. 33-35.) The cited laws do not address felons at all. And there was no reason to explicitly exclude felons from the militia since, at the Founding, "capital punishment for felonies was ubiquitous … and was the standard penalty for all serious crimes." *Medina*, 913 F.3d at 158 (cleaned up); *see supra*, Part I.B.2.b. Felons could not sign up for militia service if they were executed or imprisoned for life.

39

Charles's claim that the government's reading of these historical texts lacks a "limiting principle" also fails. (Def. Br. 19, 37.) History and tradition establish, for example, that the Second Amendment does not guarantee an unlimited right to possess every kind of weapon; rather, Congress may ban "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. History and tradition similarly establish that the Amendment does not guarantee an unlimited right to carry weapons in every kind of place; rather, Congress may ban weapons in "sensitive places." *Bruen*, 142 S. Ct. at 2133. So too Congress may regulate who may possess weapons in the first place.

Indeed, many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding, responsible citizens. In judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether a weapon is dangerous and unusual, a court must consider whether the weapon is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And States may require applicants for gun permits to pass background checks and take safety courses because such requirements ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted). This limiting principle no more allows Congress to disarm anyone it pleases than the sensitive-places doctrine

allows Congress to ban guns anywhere it pleases. *See id.* at 2133. Rather, this reading accurately reflects the Second Amendment's history and tradition and excludes only criminals and individuals whose possession of firearms would endanger themselves or others (such as underage individuals, persons with mental illnesses, drug users, and persons subject to protective orders). In any event, this case does not require defining the outmost bounds of that principle because felons fit within its core.

### C. At the least, § 922(g)(1) is constitutional as applied to Charles.

Given Charles's history of dangerous criminal conduct, § 922(g)(1) could be constitutionally applied to him. Although the district court did not separately analyze Charles's as-applied challenge (ROA.171), this Court can affirm on any ground supported by the record. *Buchholz v. Crestbrook Ins. Co.*, 65 F.4th 766, 771 (5th Cir. 2023). This Court may therefore skip the broader question of § 922(g)(1)'s facial validity and hold that the nation's historical traditions support disarming dangerous criminals like Charles.

Facial challenges "should be granted sparingly and only as a last resort." *United States v. McGinnis*, 956 F.3d 747, 752-53 (5th Cir. 2020). A party bringing a facial challenge can succeed only "by 'establishing that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting

*United States v. Salerno*, 481 U.S. 739, 745 (1987)) (brackets omitted). "When a litigant brings both as-applied and facial challenges, [this Court] generally decide[s] the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

The historical traditions described above support, at the least, disarming violent or otherwise dangerous felons. *Cf. United States v. Holden*, 70 F.4th 1015, 1018 (7th Cir. 2023) ("Even if some applications of § 922(n) would flunk [*Bruen*'s] constitutional standard … , others might illustrate the sort of person who cannot be trusted with guns."). Courts applying *Bruen* have recognized that even the most "robust view of the Second Amendment still provides 'that legislatures have the power to prohibit *dangerous* people from possessing guns.'" *Leonard v. United States*, No. 18-CR-20743-RAR-2, 2023 WL 2456042, at *10 n.7 (S.D. Fla. Mar. 10, 2023) (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting)); *see also United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *4 (E.D. Tex. Jan. 27, 2023) ("Section 922(g)(1), at a minimum, operates constitutionally under *Bruen* as applied to dangerous felons.").

Charles has a long history of dangerous criminal conduct. He has been convicted of commercial burglary. (ROA.358) He also has three convictions for residential burglary—and during two of these burglaries, he stole several firearms. (ROA.358-59). These convictions show

42

sufficient dangerousness that disarming Charles squares with historical tradition. *See United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (unpublished) (agreeing with defense counsel's *Anders* brief that "it would be frivolous to argue that § 922(g)(1) is unconstitutional as applied to" a violent felon); *United States v. Hill*, 629 F. Supp. 3d 1027, 1031 (S.D. Cal. 2022) ("[E]ven the expansive view of the Second Amendment espoused by Defendant's cited authorities approves of laws disarming felons who have committed violent felonies.").

So too for Charles's felony convictions involving cocaine, marijuana, and Xanax trafficking. (ROA.359-60.) Drug-dealing is "dangerous because [it] often lead[s] to violence." *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting) (citing *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019); *Harmelin v. Michigan*, 501 U.S. 957, 1002-03 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). "Disarming … drug dealers makes sense because their past crimes were inherently dangerous." *Id.* And "nothing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms (or ammunition) against innocent people, including those who committed drug felonies." *United States v. Young*, 639 F. Supp. 3d 515, 529 (W.D. Pa. Nov. 7, 2022) (rejecting the defendant's as-applied challenge to § 922(g)(1) based on his prior drug-dealing felonies).

Accordingly, even if the Second Amendment does not allow the government to disarm all convicted felons, § 922(g)(1) is constitutional as applied to Charles, whose criminal record shows a long history of dangerous conduct, including burglary and drug trafficking.

## II. Precedent forecloses Charles's claim that § 922(g)(1) exceeds Congress's power under the Commerce Clause.

As Charles concedes (Def. Br. 2, 12, 41, 47), precedent forecloses his Commerce Clause argument. *See United States v. Perryman*, 965 F.3d 424, 426 (5th Cir. 2020); *Massey*, 849 F.3d at 266; *United States v. Alcantar*, 733 F.3d 143, 145-46 (5th Cir. 2013).

## III. Precedent forecloses Charles's claim that the elements of a sentence enhancement under the ACCA must be alleged in the indictment and either proven to a jury beyond a reasonable doubt or admitted by the defendant.

As Charles concedes (Def. Br. 2, 12, 47, 52), this Court's precedent forecloses his sentencing enhancement argument.[10] *See United States v. Valencia*, 66 F.4th 1032 (5th Cir. 2023); *United States v. Davis*, 487 F.3d 282, 287-88 (5th Cir. 2007).

## Conclusion

For all these reasons, this Court should affirm the judgment of the district court.

---

[10] The government acknowledges that, at sentencing, it conceded this issue, agreeing that Charles should not be subject to the ACCA enhancement. (ROA.377-96.) But this Court has rejected the government's position, so the issue is foreclosed here.

Respectfully submitted,

Jaime Esparza
United States Attorney

_/s/ Lauren Tanner Bradley_____

By:    Lauren Tanner Bradley
       Assistant United States Attorney

## Certificate of Service

I certify that on September 12, 2023, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

*/s/ Lauren Tanner Bradley*
Lauren Tanner Bradley
Assistant United States Attorney

\*    \*    \*

## Certificate of Compliance

I certify that:

(1) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,701 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated:    September 12, 2023

*/s/ Lauren Tanner Bradley*
Lauren Tanner Bradley
Assistant United States Attorney